LEON OLIVE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Olive v. Comm'r
Docket No. 6063-76.
United States Tax Court
T.C. Memo 1983-195; 1983 Tax Ct. Memo LEXIS 589; 45 T.C.M. (CCH) 1249; T.C.M. (RIA) 83195; April 11, 1983. *589 During the years 1969 through 1972, P, an attorney, cashed many of the checks sent to him by insurance companies in settlement of the claims of his clients. He usually retained 30 percent of the cash proceeds in payment of his fees and paid the balance to, or on account for, his clients. P's associates also cashed some insurance checks and paid him his share of the legal fees in cash. P's cash fees were not posted to his books of account nor included on his income tax returns for 1969 through 1972. During those years, P owned two properties on which he engaged in farming and ranching. Held, the Commissioner's determination of deficiencies for 1969, 1970, 1971, and 1972, as modified herein, are sustained. Held, further, P is liable for the addition to tax under sec. 6653(b), I.R.C. 1954, for fraud for each year.Held, further, the statute of limitations does not bar the assessment and collection of the deficiencies. Held, further, P's farming and ranching were activities not engaged in for profit under sec. 183, I.R.C. 1954, and P has failed to prove that the farms were business entertainment facilities used primarily for the furtherance of his trade or business. Held, further, *590 P may not employ income averaging for 1969, 1970, or 1971. Lee H. Henkel, Jr.,Stanley H. Hackett, and Steven A. Cunningham, for the petitioner. Charles P. Hanfman, for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined the following deficiencies in, and additions to, the petitioner's Federal income taxes: Addition to Tax
Sec. 6653(b)
Year
Deficiency
I.R.C. 1954 [1]
1969
$54,310.69
$27,155.35
1970
33,645.05
16,822.52
1971
77,320.14
38,660.07
1972
134,691.66
67,345.83
After concessions by the parties, the issues for decision are: (1) Whether the petitioner received unreported income in the amount determined by he Commissioner during each of the taxable years 1969 through 1972; (2) whether any part of the underpayment of tax for any of the taxable years 1969 through 1972 was due to fraud within the meaning of section 6653(b); (3) whether the statute of limitations bars the assessment and collection of the deficiency in income tax due from the petitioner, if any, for each of the taxable years 1969, 1970, and 1971; (4) whether the petitioner *591 should be allowed deductions for losses from farming operations with respect to two tracts of South Carolina real estate for each of the taxable years 1969 through 1972 or, in the alternative, deductions for the expenses of maintaining such properties an entertainment facilities; and (5) whether the petitioner is entitled to employ income averaging for the taxable years 1969, 1970, and 1971. FINDINGS OF FACT Some of the facts have been stipulated, and those facts are so found. The petitioner, Leon Olive, was a legal resident of Charlotte, N.C., at the time he filed the petition in this case. He and his then-wife filed joint Federal income tax returns for the taxable years 1969, 1970, and 1971 with the Internal Revenue Service Center, Chamblee, Ga., on or before April 15 of 1970, 1971, and 1972, respectively. Mr. Olive filed his return for the taxable year 1972 as an unmarried head of household with the Internal Revenue Service Center, Memphis, Tenn., on June 18, 1973. On their Federal income tax returns for 1970 and 1971, Mr. Olive and his then-wife elected income averaging. The petitioner graduated from the University of Alabama with a degree in business administration. In 1954, *592 he graduated from Duke University Law School. After graduating from law school, Mr. Olive spent 2-1/2 years as a management trainee with Allstate Insurance Company. In 1957, he began practicing law in Charlotte in a partnership. The partnership continued approximately 2-1/2 to 3 years, and in 1960 or 1961, the petitioner began to practice by himself. The petitioner's accountants set up his bookkeeping system while he was in the partnership. Elizabeth Callahan came to work for the partnership as a secretary in 1957 or 1958, and the accountants told her how the books were kept. In 1966 or 1967, the petitioner began to specialize in the settlement of personal injury cases. During 1969 through 1972, his practice grew rapidly; his firm handled approximately 500 to 700 cases per year. More than 95 percent of the cases were settled during he years in issue. In a settled case, the petitioner charged a contingent fee of 30 percent of the recovery for personal injury; he charged no fee on that portion of a client's recovery representing compensation for property damage. During 1969 through 1972, Mr. Olive employed at different times four associates, including Carl Howard. The initial *593 fee arrangement with the associates provided that Mr. Olive received two-thirds of each fee over $200 on cases handled by an associate. If the fee in a case was less than $200, Mr. Olive received 50 percent. He paid all office operating expenses from his portion of the fee. He was reimbursed by his associates for their share of parking and group health insurance costs. During 1972, hhe fee arrangement changed. Thereafter, Mr. Olive received 60 percent of his associates' fees; fees under $200 continued to be split equally, and Mr. Olive continued to pay all firm operating expenses. During the years in issue, Mr. Olive also employed a bookkeeper and a secretary. Elizabeth Callahan performed some secretarial duties for him during 1969 although by that time her main function was that of bookkeeper. His secretary throughout most of 1969 and all of 1970, 1971, and 1972 was Brenda Sifford. When Mrs. Sifford began to work for Mr. Olive's law firm, Mrs. Callahan instructed her in her secretarial duties, and after Mrs. sifford was hired, Mrs. Callahan served as a secretary, from time to time, when Mrs. Sifford was unavailable. When a prospective client contacted Mr. Olive, he interviewed *594 the client and obtained the facts of the case. The client authorized Mr. Olive to obtain the client's medical information and signed a contract of representation. Mr. Olive then dictated a memorandum summarizing the facts of hhe case, which his secretary transcribed and placed in the file. The secretary called all doctors, hospitals, and insurance companies involved in the case to inform them of Mr. Olive's representation and to request information such as accident reports, hospital records, and bills necessary to assess the value of the case. The firm sometimes incurred expenses on behalf of a client to obtain necessary information. When they were incurred, Mrs. Callahan wrote a check on Mr. Olive's business checking account at the North Carolina National Bank (NCNB) to pay the expense. These payments, which were essentially advances to clients, were entered in a cash disbursements journal as a debit to account 111, accounts receivable unbilled. When the secretary had obtained all the necessary information, she composed an "analysis sheet" listing the client, the insurance company and the adjuster involved, and the client's expenses. The file with the analysis sheet was sent *595 to Mr. Olive, who inserted a demand amount and began settlement negotiations with the adjuster. When the petitioner received a settlement offer from the insurance adjuster which he regarded as reasonable, he accepted it without consulting his client and instructed the adjuster to send an insurance company check to him. He then advised his secretary that the case had been settled, gave her the file, and had her call the client to set up an appointment. In such cases, the clients always accepted Mr. Olive's recommendation of settlement. On the other hand, if the petitioner felt the settlement offer was low, he consulted with his client to give the client an opportunity to accept or reject the settlement before telling the adjuster to send the check. However, sometimes, the petitioner instructed the adjuster to send the check even if he felt that the settlement offer was low. in that case, Mr. Olive called the client into his office to see if the client would accept the settlement. In other cases, Mr. Olive discussed the settlement with the client over the phone to see if the client would accept it. The insurance company checks were made payable to the petitioner and his client *596 jointly. When the check arrived at Mr. Olive's office, his secretary put it in the file and typed a "settlement sheet." This document, prepared for every settled case, listed the client's name, the total recovery, the attorney's fee, expenses advanced for the client, and the client's unpaid medical bills, if any. The attorney's fee, expenses advanced, and unpaid bills were deducted from the total recovery. The amount remaining constituted the client's net recovery. Three copies of each settlement sheet were prepared, one each for the client, the file, and the bookkeeper. When his firm received the check from the insurance company, Mr. Olive decided whether the client was to receive his net recovery in cash or in a check, and if the client was to receive a check, Mr. Olive directed Mrs. Sifford to give the file to Mrs. Callahan. Using the information from the settlement sheet, Mrs. Callahan drew a check on Mr. Olive's client trust account at Northwestern Bank, Charlotte, N.C., payable to the client in the amount of the net recovery. When the client came in to pick up his check, he and Mr. Olive endorsed the insurance company check. Thereafter, the file was returned to Mrs. Callahan *597 who deposited the insurance company check in the client trust account. At that time, Mrs. Callahan removed a copy of the settlement sheet for her records, and she wrote checks on the trust account in payment of Mr. Olive's fee, the client's expenses advanced by Mr. Olive, and the client's unpaid medical bills. If the file was not returned to Mrs. Callahan for the preparation of such checks, she never received a copy of the settlement sheet. During the years in issue, Mrs. Callahan maintained the petitioner's books of account. These books consisted of the cash disbursements book, a journal, and a ledger. Mrs. Callaha posted every check she wrote on the trust account and the business account to the cash disbursements book. The entries were posted from check stubs. At the end of each month, Mrs. Callahan posted to the journal the amount of fees, and reimbursement of expenses, for which she had written checks on the trust account during the month. She obtained such information from the settlement sheets that she had accumulated during the month. At that time, she credited account 111, accounts receivable unbilled, for any expenses advanced for clients that had been reimbursed by *598 the deposit of an insurance company check in the client trust account. She then entered a corresponding debit to account 112, accounts receivable billed. Mrs. Callahan also debited account 112 for the amount of the petitioner's fee. If the trst account checks drawn in payment of the petitioner's fee and of advances for clients had been deposited in Mr. Olive's business account at NCNB, Mrs. Callahan credited account 112 and cleared it. The journal contained entries concerning the settlement of at most 135 cases in 1969, 216 in 1970, 230 in 1971, and 347 in 1972. Mr. Olive's income tax returns were prepared by the same accountants who had set up his bookkeeping system. They used information provided them by Mrs. Callahan. She provided them with Mr. Olive's books of account, her worksheets, bank deposit slips, and itemized deduction information which she obtained from Mr. Olive's personal checkbook. The gross receipts which the petitioner reported from his law practice on his returns for each of the years in issue came from fee information contained in account 112. This account was in turn posted from the journal entries which Mrs. Callahan made each month. When the client was *599 to receive his net recovery in cash, Mr. Olive used cash he had in his office, or if the settlement was large, he took the client to NCNB where he had his business account. There, Mr. Olive and the client endorsed the insurance company check, and Mr. Olive cashed it. He normally requested payment in one hundred dollar bills. He then paid the client his net recovery in cash on the spot. If the client had any unpaid medical expenses, Mr. Olive used a portion of the cash to purchase money orders or official bank checks payable to the creditor. The official checks and money orders listed the client as remitter. Mr. Olive retained the remainder of the cash in payment of his fee and of any expenses advanced for the client. Mr. Olive put the cash in his pocket or placed it in his safe deposit box at NCNB. When he returned to his office, he gave the money orders or official checks to Mrs. Sifford, who mailed them to the payees and closed the file. Mr. Olive's clients were often poor and had no bank accounts; consequently, they could not easily cash a check and were pleased to be paid in cash. Mr. Olive began cashing insurance drafts in 1968. Mrs. Callahan was Mr. Olive's secretary *600 during 1968 and part of 1969. The bookkeeping with respect to cases handled by Mr. Olive's associates was performed in the same manner as in cases handled by him. If a client was paid by check, Mrs. Callahan received a copy of the settlement sheet, and Mr. Olive's portion of the fee was posted to his books. However, Carl Howard had his own trust account, at least during 1971 and 1972, and cases which he handled by check did not go through Mr. Olive's trust account. Mr. Howard often paid Mr. Olive his share of the fee in cash; Mr. Howard understood that Mr. Olive wanted to be paid in cash. Mr. Howard's secretary prepared a settlement sheet for every case in which Mr. Howard was involved and gave a copy to Mrs. Callahan. Mr. Howard occasionally accompanied Mr. Olive to NCNB to cash insurance checks. On one of these occasions, Mr. Howard told Mr. Olive that banks kept more complete records of cashier's checks than of any other kind so that it was not a good idea to use such checks in the belief that banks did not keep records of them. When Mr. Olive or his associates paid clients in cash, Mr. Olive's fee generally was not osted to his books of account and, consequently, was not *601 reported as gross receipts on his income tax returns during any of the years in issue. During all or part of the years in issue, Mr. Olive maintained the following bank accounts: Northwestern Bank, Charlotte, N.C.: Client trust account, No. XXXXXX6541
Savings account, No. XXX-X-XX8587 (Mr. or Mrs. Leon Olive) North Carolina National Bank, Charlotte, N.C.: Business checking account, No. XXXXX4579
Personal checking account, No. XXXXX9942 (Leon or Eleanor Olive) Wachovia Bank and Trust Co. (Wachovia), Charlotte, N.C.: Checking account No. X-XX5-180 (Mr. and Mrs. Olive) First National Bank of Sharon (FNB), Sharon, S.C.: Checking account Farm checking account Bank of York, York, S.C.: Checking account Home Federal Savings and Loan (Home Federal), York, S.C.: Savings account No. X-2664
Peoples Savings and Loan Association (Peoples), Charlotte, N.C.: Savings account No. XXXX
During each of the years in issue, deposits to these bank accounts, excluding he client trust account, totaled: 1969
$227,183.65
1970
221,622.31
1971
241,128.17
1972
340,802.99
The petitioner was the source of all the deposits to these accounts except for $200 deposited by Eleanor to the personal checking account at NCNB in *602 1971. Mr. Olive married Mary Olive in 1946, and they had two children, Laura and Laurence Olive. In 1967, Mr. Olive and Mary separated. He moved out of their residence at 1212 Queens Road, Charlotte, and rented an apartment. Mary continued to live at the Queens Road residence until August 1970. In May of that year, she and Mr. Olive purchased a house on Wellesley Avenue in Charlotte, each providing approximately half of the $22,000 downpayment. Mary and the children moved to the Wellesley Avenue residence, and Mr. Olive moved back to the Queens Road house. He provided child support of $800 per month during the years in issue and also made cash payments to Mary. She had gross income from part-time employment of $440.00 during 1969 and $2,644.08 during 1970. Her earnings and the payments she received from Mr. Olive were deposited to her separate bank account. Mary was unaware of the bank accounts maintained by Mr. Olive during the years in issue, and she did not know whether she had signature authority on any of the his bank accounts. Mr. Olive and Mary were divorced on February 5, 1971. Mr. Olive married Eleanor on February 6, 1971, and they lived at the Queens Road house. *603 During 1971 and 1972, he spent over $103,000 to remodel such house. He and Eleanor traveled extensively, visiting Austria, Spain, Germany, and South America. While in South America, Mr. Olive purchased jewelry for Eleanor. Eleanor worked for an airline company while married to Mr. Olive. She refused to leave her job despite his request that she do so, and she deposited all but $200 of her income during 1971 and 1972 into her separate bank account. During the summer of 1972, relations between Mr. Olive and Eleanor grew strained. She left him in December 1972, and they were divorced in January 21, 1974.
Not long after Eleanor left him, Mr. Olive began dating Sibille Byron, who was then married to and living with William Byron. Mr. Olive occasionally spent the night as a houseguest of the Byrons. In the morning after one such visit in the spring of 1973, Mr. Olive used the Byrons' telephone to call insurance adjusters to discuss settlement of some of his cases. After such calls, he explained his cash settlement procedure to Mr. Byron, describing the cashing of insurance company checks and the use of cashier's checks and money orders to pay medical expenses. Mr. Olive told Mr. *604 Byron that he simply pocketed his cash fee without recording it on his books and records. During the summer of 1973, while Mr. Olive was again a guest at the Byrons' house, he told Mr. Byron that he was upset about the IRS and that he had taken money to Costa Rica and Mexico. Mr. Byron reported both conversations to the IRS within 4 or 5 months after they occurred.
In December 1973, Sibille and William Byron separated. They were divorced in 1975, and Sibille married Mr. Olive in 1976. In April 1968, Mr. Olive purchased 284 acres of land in South Carolina, known as the Bullock Creek Farm or the "lower" farm. There was a trailer on such land. In April 1969, Mr. Olive purchased approximately 200 acres of land in South Carolina, known as the Neely farm or the "upper" farm. This land had an old house and a barn on it but consisted primarily of open fields and woods. Mr. Olive hired Jack Comer to assist him in clearing, fencing, seeding, and fertilizing a portion of the Bullock Creek Farm. In addition, Mr. Olive opened the farm account at FNB and at the Bank of York. Mr. Comer had authority to write checks on the farm account at FNB. On July 17, 1972, Mr. Olive withdrew all the money *605 in the farm accounts. Mr. Olive acquired miscellaneous farm equipment and had a well drilled on the Bullock Creek farm. He joined a farmer's cooperative from which he purchased feed and other supplies. He purchased a few cattle during the years in issue. In addition to the cattle, he kept several pleasure horses and some chickens. Mr. Olive maintained a small garden and also grew some hay. During the years in issue, Mr. Olive's gross receipts from his farming activities were as follows: 1969
1970
1971
1972
Agricultural
$398.06
$356.47
$313.00
$ 441.00
stabilization and
conservation program
Receipts from
cattle sales
3,060.00
Totals
$398.06
$356.47
$313.00
$3,501.00 He did not report his gross receipts from farming activities on his income tax returns for the taxable years 1969 and 1972. During the years in issue, he deducted the following amounts as interest payments to the vendors of the farm properties on the unpaid portions of the purchase price: 1969
$1,387.89
1970
2,930.76
1971
1,795.00
1972
669.00
Mr. Olive did not file a schedule F, Farm Income and Expenses, for any of the years in issue, and he claimed no deductions for other expenses attributable to the farms. Sometime after the years in issue, *606 he sold the Bullock Creek farm and realized a gain. Mr. Olive frequently entertained his family, friends, and business associates at his farms. He used the farms to relax, and he occasionally performed farm labor. His daughter learned to ride horses during visits to the farms. Mr. Olive used cash extensively during the years in issue. He made many expenditures of cash which had not been deposited to any bank account, and he made many payments with bank checks and money orders which had been purchased with undeposited cash. He rarely used personal checks to purchase money orders or bank checks. Between July and December 1972, Mr. Olive changed his spending habits and accumulated $66,773.56 in cash. During the taxable year 1969, Mr. Olive made cash expenditures in the aggregate amount of $23,980.92 as follows: Item
Amount
Bullock Creek property
$7,710.48
Oldsmobile
3,550.00
Expenditures on South Carolina
property
Fencing
4,095.00
Telephone
162.54
Horse and equipment
1,503.30
York Farmers Coop. Exchange
78.24
Payments to Mary and children
Mary
1,807.02
Laura
1,287.03
Laurence
1,287.31
Loan repayments to Wachovia
2,500.00
During the taxable year 1970, Mr. Olive made cash expenditures in the aggrate amount *607 of $71,196.92 as follows: Item
Amount
Bullock Creek property
$7,710.48
Wellesley Avenue property
[2] 22,000.00
Tega Cay property
18,000.00
Cadillac
6,942.98
Refrigerator
368.55
Washer and dryer
353.50
Trees and shrubs
496.00
Carpeting and flooring
1,811.40
Payment to Eddie Olive
175.00
Expenditures on South Carolina
property
Fencing
438.60
Tractor
2,500.00
York Farmers Coop. Exchange
5.00
Payments to Mary and children
Mary
8,095.41
Laura
1,100.00
Laurence
1,200.00 During the taxable year 1971, Mr. Olive made cash expenditures in the aggregate amount of $106,823.22 as follows: Item
Amount
Bullock Creek property
$8,155.49
Neely property
10,887.00
Cadillac
3,578.38
Cadillac
8,900.00
Remodeling Queens Road house
Cabinets, etc.
22,572.19
Plumbing
11,505.22
Wallpapering
953.90
Painting
8,406.57
Color TV
559.52
School
50.00
Pool table
260.00
Jewelry
3,983.01
Miscellaneous
203.25
Expenditures on South Carolina
property
Well
1,901.34
Work Farmers Coop. Exchange
93.42
Payments to Mary and children
Mary
4,263.93
Laura
1,100.00
Laurence
1,200.00
Loan repayments to Wachovia
17,500.00
Loan to Clyde Sifford
750.00
During *608 the taxable year 1972, Mr. Olive made cash expenditures and accumulated cash in the aggregate amount of $159,860.84 as follows: Item
Amount
Neely property
$10,218.50
Jeep
3,966.99
Remodeling Queens Road house
Cabinets, etc.
5,992.88
Interior decorating
53,631.24
Antiques
500.00
Furs
1,869.00
Glass
156.48
School
1,319.35
Expenditures on South Carolina
property
York Farmers Coop. Exchange
981.35
Telephone
45.22
Electricity
73.51
Oil
12.88
Equipment
5.00
Southern Overseas Corp.
60.80
Payments to Mary and children
Mary
939.71
Laura
400.00
Laurence
400.00
Loan repayments
Wachovia
10,000.00
Northwestern (jeep loan)
2,514.37
Cash accumulation--July through
December 1972
66,773.56 In 1969, Mr. Olive sold a car to Mr. Howard for $700. Mr. Olive first learned that he was being investigated by the IRS when Revenue Agent Jerry Sutton contacted him in June 1972. At that time, Agent Sutton was auditing Mr. Olive's income tax return for 1970. Agent Sutton first met with Mr. Olive on July 17, 1972. At that meeting, he provided Agent Sutton with his cash disbursements journal, cash receipt journal, a general ledger, and payroll tax returns. Agent Sutton asked Mr. Olive for records of all his bank accounts. He replied that he had his client *609 trust account at Northwestern Bank, his business account at NCNB, and a personal account at Wachovia. He stated that those were all his bank accounts. He provided Agent Sutton with bank statements relating to those accounts. In response to Agent Sutton's questions, Mr. Olive stated that all his business receipts, including all his legal fees, first passed through the client trust account and that his income was represented by checks from the trust account to the business account. Mr. Olive told Agent Sutton that he had about $1,000 cash on hand in a safe deposit box at NCNB. He stated that he paid his business expenses out of his business account at NCNB and his personal expenses out of the Wachovia account. Agent Sutton spent 5 to 7 days in Mr. Olive's law office examining his books and records. While examining the bank records, Agent Sutton found a check payable to Mr. Olive or to cash deposited to a farm account. When Agent Sutton asked Mr. Olive about such account, he told Agent Sutton that he had opened the account in January 1970 and had closed it in January or February 1970. Agent Sutton's examination of Mr. Olive's tax returns and records indicated that he had understated *610 his income. When Agent Sutton disclosed his findings to Mr. Olive, Mr. Olive stated that he had received a $10,000 loan from a friend whom he did not name and that he had $25,000 "stashed away" which he wanted to hide from one of his former wives. In September 1972, Agent Sutton referred the case to the Criminal Investigation Division of the IRS (then known as Intelligence Division), because he could not document an explanation for the understatement of income and because he discovered that the farm account was not closed during 1970. After Mr. Olive learned that the IRS was investigating him, his behavior changed. On July 17, 1972, the day of his first interview with Agent Sutton, Mr. Olive twice entered his safe deposit box at NCNB. On that day and the next, he closed his South Carolina bank accounts. Mr. Olive transferred files from his office to his Queens Road home and began to carry a black briefcase containing one hundred dollar bills. After the IRS commenced its investigation in 1972, Mr. Olive took a trip to Costa Rica. On September 27, 1972, he opened a safe deposit box at the First National Bank of South Carolina, Spartanburg, S.C. He gave his address as Route 1, *611 York, S.C. He put cash into that safe deposit box. When he subsequently wrote the bank to close the box, he again used the York address. Between July and December 1972, Mr. Olive changed his spending habits and began accumulating large amounts of cash. During that period, he cashed insurance company checks made payable to his clients and himself in the amount of $73,757.28. Mr. Olive's usual fee, 30 percent of the cashed insurance drafts, was $22,127.18. During that same period, Mr. Howard paid Mr. Olive checks totaling $5,696.14 as Mr. Olive's fee for cases handled by Mr. Howard. Mr. Olive cashed these checks. On September 1, 1972, Mr. Olive sold cattle for which he received $3,060.00 in cash. Eleanor loaned Mr. Olive $10,000.00 by a cashier's check dated June 27, 1972, which Mr. Olive cashed on July 21, 1972. The loan was made at Mr. Olive's request, and he repaid it in 1972. Mr. Olive cashed another check for $10,000.00 on July 21, 1972. Such check represented the proceeds of a loan Mr. Olive received on July 17, 1972, from the Southern National Bank. On November 15, 1972, Mr. Olive received a loan of $56,450.00 from the Federal Land Bank of Columbia, S.C. On December *612 4, 1972, he deposited $50,000.00 to his account at Wachovia and retained cash of $6,450.00. Mr. Olive cashed checks totaling $2,714.57 to close his South Carolina bank accounts in July 1972. On December 1, 1972, he closed the savings account at Northwestern Bank by withdrawing $754.95. Finally, he cashed checks drawn on his account at Wachovia totaling $14,950.00 between July and December 1972. During this same period, Mr. Olive's cash expenditures and bank deposits totaled only $8,979.28. Thus, Mr. Olive accumulated $66,773.56 during the latter half of 1972. On November 6, 1972, Special Agent Brown of the Intelligence Division contacted Mr. Olive. Mr. Olive referred Special Agent Brown to his attorney. The attorney provided Agent Brown with Mr. Olive's bank records for 1969, 1970, and 1971. Agent Brown prepared analyses of checks and deposits to the NCNB business account and the Wachovia personal account. On May 31, 1973, Mr. Olive and his attorney met with Agent Brown. At that meeting, Mr. Olive told Agent Brown that all the receipts of his law practice were deposited to his trust account at Northwestern Bank, that his income came from checks drawn on the trust account *613 representing his share of fees, and that such checks were deposited in the NCNB business account. Mrs. Callahan produced Mr. Olive's books for 15 minutes so that Agent Brown could examine them. Agent Brown reviewed his analyses of the bank accounts with Mr. Olive and his attorney, and Mr. Olive made certain changes regarding checks drawn on the business account. During the meeting on May 31, 1973, Agent Brown asked Mr. Olive how much cash he had on hand on December 31, 1968, December 31, 1969, December 31, 1970, and December 31, 1971. Mr. Olive stated that he did not know how much cash he had on hand, and he refused to provide a figure for any one year. However, Mr. Olive stated that he had previously told Agent Sutton that he had approximately $40,000 cash on hand. Mr. Olive stated that he had kept this "cash hoard" in a fireproof metal box in his apartment and in the attic of his Queens Road house. On November 3, 1975, a grand jury for the Western District of North Carolina indicted Mr. Olive for willfully attempting to evade income taxes for the taxable years 1969 through 1972 in violation of section 7201. In preparation for the trial of the criminal case, Special Agent Brown *614 prepared a schedule showing losses Mr. Olive incurred in the operation of the farms. This schedule was prepared as a concession for purposes of the criminal case to give Mr. Olive the benefit of the doubt concerning the deductibility of the farming losses. On February 13, 1976, a jury in the Western District of North Carolina acquitted Mr. Olive on all four counts of the indictment. In his notices of deficiency, the Commissioner reconstructed Mr. Olive's gross receipts from the practice of law by use of the bank deposits and cash expenditures method. For each year in issue, the Commissioner determined the deposits to Mr. Olive's bank accounts (excluding the trust account) through an examination of the bank statements and deposit slips of such accounts. To the total bank deposits for each year, he added Mr. Olive's cash expenditures for such year. The cash expenditures were determined through interviews with Mr. Olive and his wife Eleanor and through an examination of receipts, bank checks, money orders, and bank records. If the bank records revealed no corresponding check for an expenditure, the Commissioner assumed that the expenditure was made with cash or with a bank check *615 or money order purchased with cash. For purposes of the trial of this case, Mr. Olive admitted or stipulated many of the cash expenditures that the Commissioner included in the computation. The Commissioner treated Mr. Olive's cash accumulation during the latter half of 1972 as a cash expenditure. From the sum of bank deposits and cash expenditures for each year, the Commissioner subtracted Mr. Olive's deposits and expenditures made from nonincome sources. Such sources included bank deposits representing transfers between bank accounts, loans to Mr. Olive, redeposits of cash, checks payable to cash or Mr. Olive in excess of $1,000, [3] *616 checks cashed by Mr. Olive and used to accumulate cash between July and December 1972, reimbursements of amounts advanced to clients, and miscellaneous nonincome sources. The Commissioner also subtracted Mr. Olive's receipts that were not connected with the law practice. Each of the subtractions included in the computation was stipulated by Mr. Olive; however, he contends that he had other nonincome sources for which he was not given credit in the Commissioner's computation. The excess of the sum of bank deposits and cash expenditures for each year over the total nonincome sources for each year equaled the petitioner's gross receipts from his law practice for such year as determined by the Commissioner. Since Mr. Olive reported his income on the accrual method *617 for taxable years 1969, 1971, and 1972, the Commissioner adjusted the gross receipts for those years upward to reflect the increase in his accounts receivable. [4] From Mr. Olive's gross receipts as reconstructed for each year, the Commissioner subtracted his gross receipts as reported each year. In this manner, the Commissioner determined that Mr. Olive failed to report gross receipts from his law practice each year. The following table sets forth the results of his analysis [5]: 1969
1970
1971
1972
Gross receipts as
determined by the
Commissioner
$168,838.16
$171,549.61
$258,567.20
$363,314.20
Gross receipts as
reported on
returns
85,325.41
119,672.76
134,401.60
190,263.00
Understatement of
gross receipts
83,512.75
51,876.85
124,165.60
172,051.20 The Commissioner further determined that some part of the resulting underpayment of tax for each of the years 1969, 1970, 1971, and 1972 was due to fraud and that therefore Mr. Olive was liable for the 50-percent *618 addition to tax provide by section 6653(b) for each year. In his notices of deficiency, the Commissioner did not employ income averaging in computing the tax liability for 1970 or 1971. The notice of deficiency for the taxable years 1969 and 1970 was issued on April 8, 1976, and the notices of deficiency for the taxable years 1971 and 1972 were issued on June 14, 1976. In an amendment to the petition, Mr. Olive claimed deductible losses from farming operations, or alternatively, deductible business entertainment expenses, for each of the years in issue. In his answer to the amendment to petition, the Commissioner denied those deductions. OPINION A preliminary issue concerning the burden of proof must be resolved before we reach the merits of the case. Section 6501(a) provides as a general rule that tax must be assessed within 3 years of the filing of a return. The notices of deficiency for the years 1969, 1970, and 1971 were not issued within 3 years after the filing of the returns for those years. Sec. 6501(b)(1). Accordingly, assessment of the deficiencies for those years is barred, unless the Commissioner affirmatively shows that the return for each such year was false *619 or fraudulent with the intent to evade tax (sec. 6501(c)(1)), or that omitted income for each such year exceeded 25 percent of the amount of the gross income stated in the return (sec. 6501(e)(1)(A)). The petitioner contends that since the notices of deficiency for the taxable years 1969, 1970, and 1971 were not issued within the period prescribed by section 6501(a), "no presumption of correctness attaches to the Respondent's determination of the Petitioner's income for those years;" thus, the petitioner concludes that the Commissioner bears the burden of proving that the petitioner understated his income in 1969, 1970, and 1971. This argument is unsound, for it confuses the validity of the determination of a deficiency with the validity of its assessment. The fact that the notices of deficiency for the taxable years 1969, 1970, and 1971 were not issued within the period provided by section 6501(a) does not shift to the Commissioner the burden of proving the correctness of the determinations contained in the notices. The Commissioner does bear the burden of proving that there was fraud or an omission of substantial income, that therefore the statute of limitations has not run, *620 and that the deficiencies determined by him may still be assessed ( Estate of Temple v. Commissioner,67 T.C. 143, 159-160 (1976); Stone v. Commissioner,56 T.C. 213, 220-221 (1971); Stratton v. Commissioner,54 T.C. 255, 289 (1970); Reis v. Commissioner,1 T.C. 9, 12-13 (1942), vacated by a Memorandum Opinion of this Court dated June 4, 1943, affd. 142 F. 2d 900 (6th Cir. 1944)), and the Commissioner cannot carry that burden by reason of the petitioner's failure to disprove any of the deficiencies determined by the Commissioner ( Reis v. Commissioner,1 T.C. at 13[6]). However, for reasons set forth subsequently, we have concluded that the Commissioner has carried his burden of proving fraud and that therefore the statute of limitations has not run on the assessment of deficiencies for the years 1969, 1970, and 1971. Accordingly, the petitioner has the burden of disproving the deficiencies determined by the Commissioner (Rule 142(a), Tax Court Rules of Practice and Procedure[7] *621 ; Welch v. Helvering,290 U.S. 111 (1933); Zarnow v. Commissioner,48 T.C. 213, 216 (1967)), and we will turn first to the amount of those deficiencies. The first issue for decision is whether the petitioner received unreported income during any of the taxable years 1969 through 1972. He makes numerous challenges to the correctness of the Commissioner's determination. First, the petitioner contends that the Commissioner's use of the bank deposits and cash expenditures method to reconstruct his income was arbitrary and unreasonable and that therefore the Commissioner's determinations of deficiency are invalid. See Helvering v. Taylor,293 U.S. 507 (1935). The petitioner conceded that he failed to report income for each of the taxable years 1969 through 1972. He also conceded that his books of account do not clearly reflect his income because the fees which he received in cash were not posted to his journal. The Commissioner may prove the existence and amount of unreported income by any method that will, in his opinion, clearly reflect the taxpayer's income. Sec. 446(b); see Holland v. United States,348 U.S. 121, 130-132 (1954); Davis v. Commissioner,239 F. 2d 187, 189 (7th Cir. 1956), affg. a Memorandum Opinion of this Court; Harper v. Commissioner,54 T.C. 1121 (1970); *622 Lipsitz v. Commissioner,21 T.C. 917, 931 (1954), affd. 220 F. 2d 871 (4th Cir. 1955). The use of bank deposits and cash expenditures has long been an acceptable method of proving income. Goe v. Commissioner,198 F. 2d 851 (3d Cir. 1952), affg. a Memorandum Opinion of this Court; Halle v. Commissioner,175 F. 2d 500 (2d Cir. 1949), affg. 7 T.C. 245 (1946); Estate of Hague v. Commissioner,132 F. 2d 775 (2d Cir. 1943), affg. 45 B.T.A. 104 (1941); Mauch v. Commissioner,113 F. 2d 555 (3d Cir. 1940), affg. 35 B.T.A. 617 (1937); Nicholas v. Commissioner,70 T.C. 1057 (1978); Estate of Mason v. Commissioner,64 T.C. 651 (1975), affd. 566 F. 2d 2 (6th Cir. 1977); Harper v. Commissioner,supra.The taxpayer bears the burden of proving that the Commissioner's determinations are erroneous, arbitrary, or unreasonable. Cracchiola v. Commissioner,643 F. 2d 1383, 1385 (9th Cir. 1981), affg. a Memorandum Opinion of this Court; Marcello v. Commissioner,380 F. 2d 494 (5th Cir. 1967), affg. a Memorandum Opinion of this Court; Estate of Mason v. Commissioner,supra.
In this case, the petitioner contends that the Commissioner must reconstruct his income in the most reasonable way possible and *623 that the bank deposits and cash expenditures method is not the most reasonable and accurate way to determine such income. Since the source of the petitioner's unreported income was insurance company checks cashed by him and his associates, and since his fee was usually a percentage of each check, he asserts that an examination of such checks would provide the most accurate determination of his unreported income for the years in issue. Thus, the petitioner concludes that the Commissioner must use the information that he possesses concerning cashed insurance checks to reconstruct the petitioner's income. The petitioner's argument is wholly without merit.The existence of unreported income may be demonstrated by any reasonable and practical method of proof available in the circumstances; the choice of method is statutorily committed to the discretion of the Commissioner. Sec. 446(b); Campbell v. Guetersloh,287 F. 2d 878, 880 (5th Cir. 1961); Davis v. United States,226 F. 2d 331, 336 (6th Cir. 1955); Schellenbarg v. Commissioner,31 T.C. 1269, 1277 (1959), affd. on this issue 283 F. 2d 871 (6th Cir. 1960); Stone v. Commissioner,22 T.C. 893, 905 (1954). The cases cited by the petitioner *624 do not support his contention. Although this Court stated in Schroeder v. Commissioner, 40 T.C.. 30, 33 (1963), that where a taxpayer maintains no records, the Commissioner has no other course "than to reconstruct income in the most reasonable way possible," this Court went on to say: Such reconstructions are rarely, if ever, exact, nor are they required to be. It is sufficient if the reconstruction is reasonable in light of all surrounding facts and circumstances.* * * [Emphasis added.] In Bushnell v. Commissioner,49 T.C. 296 (1967), the taxpayer, a doctor, recorded fee information on patient charts but did not post it to his books. One Judge of this Court found that the Commissioner was barred from recomputing the taxpayer's income by the change in net worth method because the taxpayer's books and records, including the patient charts, clearly reflected the taxpayer's income. 49 T.C. at 304-307. However, the 11 concurring Judges and the 2 dissenting Judges clearly rejected that position. 49 T.C. at 310-313. Moreover, in the instant case, it is far from certain that those insurance checks which the Commissioner was able to obtain represented all such checks cashed by the petitioner *625 and his associates. We conclude that the Commissioner did not exceed his statutory authority in choosing to reconstruct the petitioner's income by use of the bank deposits and cash expenditures method. The petitioner makes numerous challenges to specific determinations made by the Commissioner in the course of the unreported income computations contained in the notices.Preliminarily, we observe that these computations contained errors which the Commissioner conceded and corrected at trial. These concessions merely relieved the petitioner of a portion of his burden of proof; they did not affect the petitioner's burden as to those portions of the computation not conceded. Estate of Mason v. Commissioner,supra at 659. The petitioner disputes the Commissioner's determination that he was the source of all the money deposited to his bank accounts during the taxable years 1969 through 1972.The petitioner asserts that Mary could also have made deposits to the Wachovia and Northwestern bank accounts which she held jointly with the petitioner during 1969 and 1970.However, during those years, Mary was separated from the petitioner. Although she was working part-time, she deposited all her *626 earnings, as well as payments to her from the petitioner, in her separate bank account. She was unaware of the bank accounts maintained by the petitioner during 1969 and 1970, and she was not aware that she had signature authority on any such account. The petitioner has not cited any particular deposit which he claims was made by Mary. Thus, we conclude that Mary was not the source of any of the deposits to the petitioner's bank accounts during 1969 and 1970. The petitioner also asserts that Eleanor could have made deposits to the Wachovia and NCNB bank accounts which she held jointly with the petitioner during 1971 and 1972. Eleanor was employed by an airline while married to the petitioner. But both the petitioner and Eleanor testified that she deposited all her earnings to her separate bank account during 1971 and 1972. Eleanor did testify that in 1971 she deposited $200 to "the joint checking account." Accordingly, the petitioner must be allowed that amount as an offset to the sum of bank deposits and cash expenditures for 1971. The petitioner makes several specific objections to the Commissioner's determination of his cash expenditures and cash accumulation during the *627 years in issue. He asserts that there is no direct evidence that he was the source of the money deposited to the children's bank accounts. [8] Mary maintained custodial accounts for the benefit of Laurence and Laura Olive. The Commissioner examined the passbooks to determine the deposits made to each account each year, and those amounts were stipulated. Mary was unable to remember what portion of the money was contributed by the petitioner, but she was "sure some of those funds came from" the petitioner. Mary worked part-time during the years in issue, but she had gross income of only $440.00 during 1969 and $2,644.08 during 1970. Thus, we find it highly unlikely that Mary was the source of the deposits to the children's accounts. Under such circumstances, the petitioner has failed to prove that he was not the source of such deposits. The petitioner also challenges the Commissioner's determination that he began accumulating cash during the last 6 months of 1972. He asserts in his brief that he did not accumulate *628 any cash and that the Commissioner's determination lacks a factual basis. In his notice, the Commissioner included in the computation of the cash accumulation $87,824.29, the full amount of insurance company checks cashed by the petitioner during the last 6 months of 1972. The Commissioner subsequently realized that such amount included the portions of such checks paid to or on behalf of the client; consequently, he modified his computation and included only 30 percent of the face amount of the checks, since that was the petitioner's usual fee. He also eliminated certain checks that had been duplicated. After such modifications, the Commissioner determined that during the last 6 months of 1972, the petitioner accumulated $22,127.18 in fees from cashed insurance company checks. The petitioner argues that the Commissioner acted arbitrarily in computing the petitioner's income for 1969, 1970, 1971, and the first half of 1972 by reference to his cash expenditures and by switching to a computation of his cash accumulations for the last half of 1972. The petitioner's contention is specious. The bank deposits and cash expenditures method of reconstructing income proceeds upon the assumption *629 that income is either saved or spent. An undeposited cash hoard is a form of savings which, to the extent it is derived from taxable income, should be included in the bank deposits and cash expenditures computation to clearly reflect income. See Morrison v. United States,270 F. 2d 1, 2 (4th Cir. 1959). Here, there is reason to believe that the petitioner accumulated a cash hoard in the last half of 1972, and under the circumstances, such cash hoard must be taken into consideration in computing his income for the year. The petitioner urges that the Commissioner's cash accumulation computation is flawed because it is based on an "erroneous assumption," that the petitioner retained as his fee 30 percent of the proceeds of the insurance company checks cashed by him during the second half of 1972. It is true that the petitioner did not always receive a fee of 30 percent of a client's total recovery. However, the petitioner's books do not reflect fees from cash settlements, and we have been unable to determine whether the petitioner received a fee of less than 30 percent of any of the insurance checks cashed by him in the latter half of 1972. Under these circumstances, we feel that *630 the Commissioner's assumption was reasonable. Where the lack of evidence from which a more accurate determination can be made results from the petitioner's failure to keep adequate records, we do not require the Commissioner to reconstruct the petitioner's income with clinical precision. Schroeder v. Commissioner,supra.
The remainder of the 1972 cash accumulation computation was stipulated and has not been challenged by the petitioner. Accordingly, we sustain the Commissioner's determination that the petitioner accumulated $66,773.56 in cash between July and December 1972. This accumulation was properly included in the income reconstruction for the taxable year 1972. The petitioner contends that he had more nonincome deposits and nonincome cash sources during 1969 through 1972 than those included by the Commissioner in the bank deposits and cash expenditures computation. The petitioner's primary attack on this portion of the computation is his assertion that, at the beginning of 1969, he had accumulated a cash hoard of $40,000 to $50,000. He asserts that he spent such money during the years in issue. Such cash expenditures were not made from current income; thus, the petitioner *631 concludes that the sum of bank deposits and cash expenditures should be reduced by the amount of the cash hoard to accurately reflect his income in the years in issue.
In his notice of deficiency, the Commissioner credited the petitioner with a $3,000 cash deposit made on January 14, 1969, from prior years' accumulations. The Commissioner did not credit the petitioner with any other accumulated cash as of the beginning of 1969. At trial, the petitioner testified that he had a cash hoard of between $40,000 and $50,000 at the beginning of 1969. He stated that he had accumulated it from his earnings and from the sale of a house for cash prior to the years in issue. He testified that he spent the cash hoard on real estate--specifically, the payments on the Bullock Creek farm, the Neely farm, and the Tega Cay property, all made between 1968 and 1972. The petitioner also declared that, because of financial reverses suffered by his family during the depression, he felt that the only secure investments were cash and land. He explained that he stored the cash in a metal box which he kept in the trunk of his car or in the bedroom closet in his apartment. He said that he put the metal box *632 in the attic of the Queens Road residence when he moved back to that house in August 1970. In addition, the petitioner testified that he told neither Mary nor his accountants about the cash hoard. He admitted that he did not disclose its existence on loan applications nor on intangible asset tax returns filed with the State of North Carolina. To corroborate his testimony regarding the cash hoard, the petitioner presented the testimony of Luther Caldwell. Mr. Caldwell testified that he had known the petitioner for about 20 years and that he met the petitioner when he was managing a club in Charlotte which the petitioner often frequented after office hours. Mr. Caldwell stated that the petitioner invited him to the Bullock Creek farm in the summer of 1968 and that while they were at the farm, the petitioner opened the car trunk revealing a metal box which he said contained $50,000. Mr. Caldwell reported that the petitioner stated that he and his wife had been having marital problems, that he had been saving the money for his children if anything should happen to him, and that he wanted Mr. Caldwell to know that the money was there and to "check to see if * * * [the children] got *633 it." Mr. Caldwell said that the petitioner opened the box, revealing "a lot of money" which Mr. Caldwell did not count. Mr. Caldwell also testified that he viewed the box again later in the summer of 1968 at the Queens Road house. He said that the petitioner took him up to the attic and declared that he planned to hide the box there. Mr. Caldwell testified at Mr. Olive's criminal trial as a character witness, but he did not then testify about the existence of the cash hoard. This Court is not bound to accept testimony at face value even when it is uncontroverted if it is improbable, unreasonable, or questionable. Quock Ting v. United States,140 U.S. 417 (1891); Fleischer v. Commissioner,403 F. 2d 403, 406 (2d Cir. 1968), affg. a Memorandum Opinion of this Court; Archer v. Commissioner,227 F. 2d 270, 273 (5th Cir. 1955); Dougherty v. Commissioner,60 T.C. 917, 932-933 (1973). For the reasons set forth below, we have concluded that the petitioner has not carried his burden of proving that he had a cash hoard of between $40,000 and $50,000 at the beginning of 1969. The petitioner changed his cash hoard story several times during the course of the Commissioner's investigation. *634 When first contacted by Agent Sutton, the petitioner stated that he had about $1,000 "cash on hand." Since Agent Sutton was then auditing the taxable year 1970, this statement probably referred to cash on hand on January 1, 1970. This statement is still inconsistent with the petitioner's current assertion that, after making certain payments out of the hoard during 1969, the petitioner's cash hoard amounted to approximately $25,000 at the beginning of 1970. He attempts to explain this inconsistency by arguing that he understood Agent Sutton to be asking about cash "in his pocket" not about a personal cash hoard. We find this explanation improbable, especially considering the petitioner's background in business and in law.
When Agent Sutton informed the petitioner that he had apparently underreported his income, the petitioner stated that he had $25,000 "stashed away" that he was hiding from one of his former wives. Apparently, the petitioner had, by that time, learned the meaning of the phrase "cash on hand." At the May 31, 1973, meeting with Special Agent Brown, the petitioner again changed his story. Although he refused to specify the amount of his cash hoard, he told Special *635 Agent Brown that he had previously told Agent Sutton that he had $40,000 cash on hand. Moreover, the petitioner's frequent and extensive use of bank accounts and safe deposit boxes strongly indicates that the petitioner had no fear of banks. Perhaps his depression experiences did leave him with the conviction that cash and land were the only safe investments, but he did not explain why he failed to put his cash hoard in a federally insured account or in a safe deposit box.The assertion that the petitioner drove around with $40,000 to $50,000 in the trunk of his car, or that he left that amount in his apartment closet when much safer alternatives were available, simply defies belief. The petitioner testified that he did not reveal the existence of his cash hoard to Mary. His reticence would be understandable if, as he told Agent Sutton, and as was indicated by Mr. Caldwell's testimony, the petitioner was hiding cash in anticipation of his divorce. However, at the trial of this case, the petitioner vehemently denied that he was trying to cheat Mary Olive. He also failed to reveal the hoard to his accountants. Although the petitioner borrowed almost $15,000 from Wachovia Bank in *636 1969 and almost $10,000 in 1970, he did not tell the bank about the cash hoard. The petitioner defended this secrecy by stating that asking to borrow money when one has a cash hoard of $50,000 "makes you look like a fool." The lack of any evidence that the petitioner revealed the existence of the hoard to anyone, other than Mr. Caldwell, at the time he was supposedly accumulating it casts doubt upon his testimony. The only evidence offered by the petitioner to corroborate his cash hoard story was the testimony of Mr. Caldwell. We found Mr. Caldwell's testimony singularly unconvincing. He said that he did not know how much money was in the box, just that it was "a lot." He declared that the petitioner showed him the money so that he could see that the petitioner's children received it if anything happened to the petitioner. The petitioner is a lawyer and must have known that Mr. Caldwell could not possibly have any control over the distribution of the petitioner's property. Moreover, we find it difficult to believe that the petitioner would have hidden his cash hoard in the Queens Road house in the summer of 1968, when he was living elsewhere and when Mary Olive, the person from *637 whom he was supposedly hiding the money, was living in that house. The story is equally incredible if we interpret it to mean that the petitioner was merely showing Mr. Caldwell where he intended to hide the money when he returned to the Queens Road house. Mr. Olive did not return to that house until August 1970, and we cannot believe that he would show Mr. Caldwell where he intended to hide the money 2 years in the future. Finally, the fact that the petitioner did not offer Mr. Caldwell's testimony regarding the existence of the cash hoard in his defense at the criminal trial in 1976 when he was facing a possible jail term furthers our belief that Mr. Caldwell's testimony is a recent fabrication and is not to be believed. Cf. United States v. Shields,571 F. 2d 1115, 1118-1119 (9th Cir. 1978) (it is permissible, in a criminal prosecution for tax evasion, to impeach the testimony of the defendant's accountant regarding the existence of a cash hoard with evidence that the accountant failed to mention the cash hoard when asked at a pre-trial conference if the defendant had any nontaxable sources of funds). Since we find the testimony of the petitioner and of Mr. Caldwell to be *638 unworthy of belief, we reject the petitioner's assertion that he had amassed a cash hoard at the beginning of 1969. Moreover, we reject the petitioner's argument that the Commissioner must prove with reasonable certainty cash on hand at the beginning of the years in issue.The criminal cases repeatedly cited by the petitioner in support of his contention are inapposite. In this civil case, the petitioner has the burden of proving that the Commissioner's determination of opening cash on hand was erroneous, and he has failed to do so. The petitioner asserts that he had several other nontaxable deposits and cash sources not accounted for in the Commissioner's computations. The petitioner contends that he had more transfers between bank accounts than those set forth in the notices of deficiency. Specifically, he argues that the Commissioner has made no reduction for checks drawn on the petitioner's client trust account payable to cash or to the petitioner. The checks relied on by the petitioner were issued to his clients in payment of their net recoveries and do not support his contention that such checks represented nonincome sources. Furthermore, we observe that the Commissioner *639 did not include the trust account in the bank deposits and cash expenditures analysis because to have done so would have yielded an unrealistically high estimate of the petitioner's income. Many of the deposits to the trust account represented the money of the petitioner's clients, not of the petitioner. The petitioner asserts that he made more redeposits of cash and received more loans than those included by the Commissioner in his computation. Since the petitioner has failed to specify any such loans or redeposits of cash, we reject the petitioner's contention. The petitioner also claims that the Commissioner erroneously failed to include as a nontaxable source of cash for redeposit or expenditure the petitioner's checks drawn payable to cash, or to the petitioner, in amounts of $1,000 or less. The Commissioner responds that the petitioner must have made numerous small personal cash expenditures (e.g., for food and entertainment) that were not included in the sum of bank deposits and cash expenditures. Since such expenditures were not included in the total of cash expenditures, the checks which provided the cash for such expenditures need not be allowed as an offset from total *640 deposits and expenditures. [9] The petitioner replies that these smaller checks may have provided sources of cash for deposits that were counted by the Commissioner in his computation of gross receipts. Where the Commissioner could determine that the proceeds of any of the checks were deposited to another account, the Commissioner credited such check to the petitioner as a transfer between accounts. The petitioner claims that other checks may have been deposited to his bank accounts but has not specified any particular check. Several of the checks which the petitioner contends may have provided cash for redeposit were obviously payments to third persons. Many of the checks were apparently cashed at NCNB. The petitioner has not specified a single deposit supposedly made with the proceeds of any of the cashed checks, and we cannot determine whether the proceeds of any check were in fact redeposited to any of the petitioner's accounts. Moreover, since small cash expenditures were not included in gross receipts, it was reasonable for the Commissioner to refuse to treat smaller checks to cash as nonincome sources. Under the circumstances, the petitioner's general *641 allegation that some of the checks or their proceeds may have been redeposited is insufficient to sustain his burden of proof.
The petitioner argues that he should be given credit for the proceeds from the sale of a Jeep in 1972 as a nontaxable source of cash, but he has offered no evidence that he sold a Jeep in 1972. He also contends that he sold certain items of personal property to Carl Howard during the years in issue and that he should be allowed the proceeds from such sales as nontaxable sources of cash. The petitioner testified that in 1969 he sold a car to Mr. Howard for about $2,000. Mr. Howard testified that he purchased the car, but he was not sure of the purchase price. He believed he might have paid the petitioner $700. Mr. Howard also testified that he bought a television set, a mantel piece, a light fixture, and a couch from the petitioner between 1969 and 1972, but he had no idea how much he paid for those items. We conclude that the petitioner has failed to prove that he sold a Jeep in 1972 and that he has failed to prove the amount of the proceeds from the sale of the television, mantel piece, light fixture, and couch to Mr. Howard. However, we have determined *642 that the petitioner received $700 from the sale of a car to Mr. Howard in 1969. Accordingly, the petitioner must be credited with that amount as a nontaxable source of cash for 1969. The petitioner contends that the Commissioner erred in not crediting him with reimbursements that he received from his associates for parking and health insurance expenses as a nontaxable source of cash. However, it appears that the petitioner included the reimbursements in his income for each year in issue and then deducted them as a miscellaneous business expense. Since the petitioner reported those amounts as income, the petitioner was given credit for them in the Commissioner's computation. In determining the petitioner's unreported income from the practice of law, the Commissioner subtracted the petitioner's gross receipts as reported on his return, including the reimbursements, from the total gross receipts as reconstructed by the Commissioner.Thus, the reimbursements were subtracted in determining the petitioner's unreported gross receipts. To give him credit for the reimbursements as a nontaxable source of cash would cause the reimbursements to be subtracted twice. Finally, the petitioner *643 challenges the Commissioner's addition of $10,450.99 to the amount of the reconstructed gross receipts for 1972.The Commissioner made such adjustment to convert the bank deposits and cash expenditures computation, which is essentially a cash flow method, to an accrual method. The petitioner insists that the adjustment for the increase in accounts receivable is inconsistent with the bank deposits and cash expenditures method of reconstructing income. This argument is wholly devoid of merit. The petitioner used the accrual method of accounting to report the income from his law practice in 1969, 1971, and 1972, and during 1972, his accounts receivable increased by $10,450.99. That amount represented income earned by the petitioner that was not collected during 1972. Since the petitioner's actual gross receipts for 1972 were reconstructed by the Commissioner using a method which only reflected amounts collected during 1972 (and deposited or spent), the adjustment for the increase in accounts receivable is necessary to clearly reflect the petitioner's income accrued in 1972. Failure to make the accounts receivable adjustment would result in an understatement of the petitioner's gross *644 receipts. [10] Accordingly, we sustain the Commissioner's adjustment, as modified by the stipulation. In summary, the Commissioner's determination of the amounts of the petitioner's unreported gross receipts for each year in issue, as modified by concessions and stipulations, is sustained in all respects except that the petitioner must be given credit, as a subtraction from the sum of bank deposits and cash expenditures, for the following items: 1969 - $700 proceeds from sale of car; 1971 - $200 deposit to NCNB joint account by Eleanor Olive. The second issue for decision is whether any part of the underpayment of tax for any of the taxable years 1969 through 1972 was due to fraud within the meaning of section 6653(b). Such section provides that if any part of any underpayment of tax required to be shown on a return *645 is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. The Commissioner has the burden of proving, by clear and convincing evidence, that some part of the underpayment for each year was due to fraud. Sec. 7454(a); Rule 142(b); Levinson v. United States,496 F. 2d 651 (3d Cir. 1974); Miller v. Commissioner,51 T.C. 915, 918 (1969). The Commissioner will carry his burden if he shows that the taxpayer intended to evade taxes which he knew or believed that he owed by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. Stoltzfus v. United States,398 F. 2d 1002, 1004 (3d Cir. 1968); Webb v. Commissioner,394 F. 2d 366 (5th Cir. 1968), affg. a Memorandum Opinion of this Court; Acker v. Commissioner,26 T.C. 107 (1956). The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F. 2d 1383 (8th Cir. 1978). Fraud will never be presumed. Beaver v. Commissioner,55 T.C. 85, 92 (1970). However, fraud may be proved by circumstantial evidence since direct proof of the taxpayer's intent *646 is rarely available. The taxpayer's entire course of conduct can often be relied on to establish the requisite fraudulent intent. Stone v. Commissioner,56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner,53 T.C. 96, 105-106 (1969). The consistent, substantial, and unexplained understatement of income is highly persuasive evidence of fraud. Marcus v. Commissioner,70 T.C. 562, 577 (1978), affd. without published opinion 621 F. 2d 439 (5th Cir. 1980); Harper v. Commissioner,54 T.C. at 1139; Smith v. Commissioner,31 T.C. 1, 9 (1958). The petitioner failed to include on his returns for each of the years in issue substantial amounts of the receipts from his law practice. These omissions produced correspondingly large understatements of the petitioner's taxable income and underpayments of income taxes. Since the petitioner stipulated to many of the items included in the bank deposits and cash expenditures computation, our determination of unreported income for the years in issue is not based solely on the petitioner's failure to carry his burden of proof. The petitioner asserts that an accidental breakdown in his bookkeeping system caused him to omit from his books and tax returns *647 the fees which he derived from cases which he settled in cash; thus, he claims that the omissions were innocent and not fraudulent. The petitioner testified that he cashed insurance company settlement checks as a convenience to his clients, many of whom prefered to be paid their net recovery in cash. He stated that he did not know that the fees which he received in cash were not reported on his income tax returns. He said that he had nothing to do with the firm's bookkeeping and that he had no idea how the firm kept its accounts. He claimed that he never discussed with Mrs. Callahan what books she kept and what went into them, that he assumed that she was getting the information she needed, that he believed that all settlement sheets were going to her, and that he was unaware that she used the settlement sheets to compute his income. He testified that he had no idea how the figures on his income tax returns were computed and that he would not have been able to check the accuracy of his returns had he wished to do so. He declared that he "accounted" for his finances on a simple cash-flow basis, withdrawing from the firm's business account any money not need to meet the firm's *648 current obligations. Mrs. Callahan testified that, during the years in issue, she was unaware that the petitioner was cashing insurance company settlement checks. She and the petitioner testified that they first learned in 1973 that fees paid in cash had not been reported on his income tax returns.She claimed that in that year, the associates reported to her that the fees which they had paid to the petitioner had not been treated as income on his books and that, as a result, such payments were reported on his return for that year. However, although the amount was treated as income, it was treated as a reimbursement of the expenses paid by the petitioner on behalf of the associates. The petitioner's testimony concerning the mechanics of this purported "accidental bookkeeping failure" is ambiguous, evasive, and at times contradictory. He said that in the "usual" case, Mrs. Callahan received the file before the client came in to be paid so that she could prepare a net recovery check drawn on the trust account. However, he admitted that if the client was to be paid in cash, then Mrs. Callahan never received the file. In that situation, a net recovery check was not needed before the *649 settlement and checks to the client's medical creditors were not needed after the settlement since these expenses had already been paid by money order or bank check. Therefore, when an insurance company check was received by the firm, someone had to decide whether the file was to be handled in the "usual" manner or whether the client was to be paid in cash. After some vacillation concerning who made that decision, the petitioner eventually admitted that he supposed that he told someone, probably the secretary, before the client came in to collect, that the settlement would be paid in cash. The petitioner testified that there were reasons for diverting a file from Mrs. Callahan prior to settlement. In some cases, he said that he would instruct the adjuster to send the settlement check even if he thought the offer was low and even if he was not sure that the client would accept it. He stated that if he was not sure that the client would accept the settlement, Mrs. Callahan would not prepare a net recovery check before the settlement conference. However, this testimony by the petitioner contradicted his earlier testimony that he did not instruct the adjuster to send the check unless *650 he was sure the client would accept the offer.He also claimed that the file would not be sent to her if he did not know the amount of the client's unpaid medical bills. In such a case, the amount of the net recovery could not be computed until after consultation with the client. If the settlement was to be paid in cash, the file had to be diverted from Mrs. Callahan so that she would not write a net recovery check on the trust account. Since the secretary routed the file through the office, she had to know whether to send it to Mrs. Callahan or to the petitioner. Neither the secretary nor Mrs. Callahan could or would have undertaken to make that decision; it had to be made by the petitioner. It appears that the petitioner's final position at trial was that cash settlements were only made in cases where the file had been diverted from Mrs. Callahan for other reasons, e.g., that he did not know the correct amount of the net recovery check, or did not know whether the client would accept the settlement; but the petitioner admitted that he often diverted the file from Mrs. Callahan because he knew, without consulting his client, that a settlement would be paid in cash. Once the file *651 was diverted from Mrs. Callahan, she had no access to it, and thus, she did not remove a copy of the settlement sheet for her bookkeeping records. We are not convinced that the petitioner paid his clients and himself in cash merely for the clients' convenience or at their request, since he, not the clients, determined that insurance checks would be cashed. Moreover, a large proportion of the cases settled by him during the years in issue were not posted to his journal. Clearly, the petitioner's check cashing and consequent failure to record and report his fee were not exceptional occurrences, as the petitioner contends. Rather, these actions were part of a course of conduct designed to conceal a substantial portion of the petitioner's income.
The petitioner could have satisfied his clients' purported desire for cash by making one minor change in his "usual" office procedures. The petitioner could have had Mrs. Callahan prepare a trust account check for the client's net recovery in all cases. If the client balked at taking the check, the petitioner could have cashed the trust account check for the client or could have accompanied the client to the bank and arranged for the cashing *652 of such check. The client's unpaid medical expenses and the petitioner's fee and advances could then have been paid by trust account check in exactly the same manner as if the client had accepted payment by check. Instead, the petitioner went out of his way not to leave a paper trail, devising for cash cases a wholly different office procedure which required his affirmative interference in the "usual" routing of a case file through his office. After cashing the insurance company check, he did not deposit his legal fees, which would have left a bank record, but instead pocketed the money or placed it in a safe deposit box. The conclusion is inescapable that the cash fees provided the source of the cash which the petitioner later spent to purchase the money orders he used for nearly all his large purchases and expenses. Furthermore, the petitioner purchased money orders and bank checks to pay the clients' medical bills, apparently in the belief that the bank kept no records of those checks. Such checks and money orders listed the client as remitter and nowhere indicated that the petitioner was connected with the payment. The petitioner's conduct was intimately entwined with the *653 inaccurate recording of business income. See Estate of Temple v. Commissioner,67 T.C. at 162. The secretive nature of the cash settlement process strongly indicates that tax evasion, not client convenience, inspired the cash payments. See Spies v. United States,317 U.S. 492, 499 (1943)(handling one's affairs so as to avoid the records usually made in similar transactions supports an inference of a willful attempt to evade tax). Moreover, we do not believe that Mrs. Callahan was unaware that the petitioner and his associates were cashing insurance company checks during the years in issue. The petitioner began his check cashing scheme in 1968 while Mrs. Callahan was his secretary, and she occasionally served as the secretary during the years in issue. Mrs. Sifford, who became his secretary during 1969, testified that she was aware of the check-cashing practice because in a cash settlement case, she mailed bank checks and money orders, not trust account checks, to the client's medical creditors. As the petitioner's secretary at a time when he was cashing insurance checks, Mrs. Callahan, too, must have known that the petitioner engaged in that practice. Furthermore, Mrs. Callahan *654 testified that she prepared a trust account check in every case for which she received a file. Thus, she must have been aware that she was not receiving the files or settlement sheets for cases which were settled in cash. Finally, Mr. Howard testified that his secretary prepared a settlement sheet for each case settled by him and gave the sheet to Mrs. Callahan. Yet, the sheets reflecting cash fees which the petitioner's associates paid him were not reflected on the petitioner's books. We conclude that Mrs. Callahan knew of the petitioner's check-cashing scheme during the years in issue and that she was well aware that fees received in cash during that time were neither posted to the petitioner's books nor reported on his income tax returns. We cannot believe that Mrs. Callahan would have permitted this situation to continue without at least the tacit acquiescence of the petitioner. We cannot accept the petitioner's claim that he had no idea how his books were kept or how his tax liability was computed. He was an attorney with an undergraduate degree in business administration. Moreover, the simple bookkeeping system in use at his firm had been in place since the late 1950's, *655 and he had plenty of time to become familiar with it. The petitioner was astute enough to realize that he "was always making a profit during that period of time." He was obviously a highly successful businessman, and we are not convinced that one with his education and background could have been as careless about keeping track of his income as he would have us believe. Finally, the petitioner spent large amounts of cash during the years in issue; for example, during 1971 and 1972, he paid by cash or money order over 70 percent of his reported taxable income for those years to remodel his house. It defies credulity to believe that he could have spent that much money without realizing that he had substantially understated his taxable income. For all the reasons discussed above, we reject as unworthy of belief the petitioner's assertion that his understatements of income were the result of an accidental breakdown in his bookkeeping system. Although his failure to offer a credible explanation for the substantial understatements of income strongly suggests fraud, we need not premise a finding of fraud on that ground alone.
Conduct designed to mislead the Commissioner's agents and to *656 conceal income strongly evidences an intent to evade tax. Estate of Upshaw v. Commissioner,416 F. 2d 737, 741 (7th Cir. 1969), affg. a Memorandum Opinion of this Court; Smith v. Commissioner,32 T.C. 985, 987 (1959). The petitioner's conduct after he learned that the IRS was investigating him reveals a continuing pattern of deceit. He tried to mislead Agent Sutton during their initial interview on July 17, 1972. He told Agent Sutton that all his legal fees passed through his client trust account and that his income could be determined from checks drawn on the trust account to his business account; yet, he knew that his cash fees did not pass through his bank accounts. The petitioner also told Agent Sutton that his only bank accounts were the trust account, the business account, and his personal checking account at Wachovia. He did not mention the farm accounts until Agent Sutton's investigation disclosed them; then the petitioner told Agent Sutton that he had closed the accounts in January or February 1970. In fact, he closed his South Carolina bank accounts on July 17, 1972, just after his first meeting with Agent Sutton. Finally, we have already observed that the petitioner's *657 cash hoard story changed several times during the course of the investigation. It is apparent that the petitioner concocted the story after the fact and modified it as necessary to explain the underpayments. William Byron testified hat he was told by the petitioner that he was not reporting cash fees on his tax returns and that he was secreting money in Costa Rica and Mexico because he was concerned about the IRS investigation. The petitioner attacks Mr. Byron's testimony for bias, claiming that Mr. Byron still harbors a grudge against him because he began dating Mr. Byron's wife Sibille while Sibille was still living with and married to Mr. Byron. However, Mr. Byron's testimony revealed a detailed knowledge of the petitioner's check-cashing scheme, and the petitioner has offered no explanation of how Mr. Byron could have acquired such knowledge other than from Mr. Olive. Furthermore, Mr. Byron's testimony regarding the petitioner's hiding money in Costa Rica was at least partially confirmed by Eleanor, who testified that the petitioner went to Costa Rica after the IRS commenced its investigation of him. The petitioner offered no explanation of the purpose of that trip. We *658 have considered the weight to be accorded Mr. Byron's testimony, and we find it believable. The petitioner's other actions during the latter half of 1972, when viewed as a whole and in light of the circumstances of this case, strongly suggest that the petitioner was trying to cover his tracks. He abruptly stopped spending large amounts of cash. Instead, he began accumulating cash which he carried in a black briefcase. He visited Costa Rica to secrete money there, and he opened a new safe deposit box in Spartanburg, S.C., for the same purpose. He gave the bank a South Carolina address. Finally, he began transferring case files from his office to his house. While his books of account supported his returns as filed, an examination of the case files would have revealed that many cases were not posted to the books. In light of the petitioner's deceptive conduct, the implication is strong that he was trying to conceal these files from the IRS. In conclusion, the petitioner's conduct during the years in issue clearly reveals a pattern of deceit and duplicity which had as its object the evasion of taxes that he knew to be owing. His substantial underpayment of income taxes, his failure *659 to offer anything other than an ambiguous, evasive, and contradictory explanation for them, and his other deceptive conduct clearly demonstrate that the underpayments were due to fraud. The cash settlement procedure, which was responsible for the understatements of income, was used throughout each of the years in issue. Consequently, we hold that the Commissioner has proved by clear and convincing evidence that some part of the underpayment of taxes for each of the taxable years 1969, 1970, 1971, and 1972 was due to fraud within the meaning of section 6653(b). The third issue for decision is whether the assessment and collection of the deficiencies for the years 1969, 1970, and 1971 is barred by the statute of limitations. Since the Commissioner has sustained his burden of proving fraud for each such year, the statute of limitations remains open under section 6501(c)(1). Estate of Temple v. Commissioner,67 T.C. 143, 159-160 (1976); Harper v. Commissioner,54 T.C. 1121, 1142 (1970). The fourth issue for decision is whether the petitioner should be allowed deductions for losses from farming operations or, in the alternative, deductions for expenses of operating the two farms as *660 entertainment facilities. The petitioner did not claim deductions for the losses or expenses of operating the farms on his returns for any of the years in issue. At the beginning of the trial of this case, he was granted leave to amend his petition to claim such losses or expenses for each year. The amounts of the losses claimed were taken from a schedule prepared by the Commissioner's agents as a concession in the petitioner's criminal case. In the present case, the Commissioner denied each allegation contained in the amendment to the petition. Accordingly, the petitioner bears the burden of proving that the farm losses or expenses are deductible. Rule 142(a); Welch v. Helvering,supra.
The petitioner contends that he maintained and operated his two farms during the years in issue with the specific intention and good-faith expectation of making a profit and that he is entitled to deduct his farming losses. If his farming operations were an activity not engaged in for profit, section 183(a) provides that no deduction attributable to the farming shall be allowed except as provided by section 183. Section 183(b)(1) provides that deductions which would be allowable without regard *661 to whether the activity was engaged in for profit shall be allowed, and section 183(b)(2) provides that deductions which would be allowable only if the activity is engaged in for profit shall be allowed, but only to the extent that the gross income from the activity exceeds the deductions otherwise allowable under section 183(b)(1). Section 183(c) defines an activity not engaged in for profit as any activity other than one with respect to which deductions are allowable under section 162 or under paragraph (1) or (2) of section 212. An individual is engaged in an activity for profit if he engaged in the activity "with the actual and honest objective of making a profit." Dreicer v. Commissioner,78 T.C. 642, 645 (1982), on appeal (D.C. Cir., June 1, 1982). Although a reasonable expectation of profit is not required, an examination of all the facts and circumstances of each case must indicate that the taxpayer engaged in the activity with the objective of making a profit. Sec. 1.183-2(a), Income Tax Regs.; Dreicer v. Commissioner,supra;Golanty v. Commissioner,72 T.C. 411, 425-426 (1979), affd. without published opinion 647 F. 2d 170 (9th Cir. 1981). The regulations under section 183 *662 (sec. 1.183-2(b)) provide a list of nine factors to be weighed in determining whether an activity is engaged in for profit. Such factors are derived principally from prior case law (see Benz v. Commissioner,63 T.C. 375, 382-383 (1974)) and include: (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profit, if any, which is earned; (8) the financial status of the taxpayer; and (9) whether elements of recreation or personal pleasure are involved. An examination of these factors, in light of all the facts and circumstances of this case, reveals that the petitioner has not proved that he was engaged in farming for profit during the years in issue. His primary contention is that the manner in which he operated the farms demonstrates his profit objective. It is true that he hired *663 at least one person to assist him in operating the farms, that he maintained farm bank accounts, and that he cleared, fenced, fertilized, and seeded the land to some extent. He also grew some hay, maintained a garden, purchased a few head of cattle and some farm equipment, and worked on the farms occasionally. However, the evidence indicates that the petitioner's farming activities were not substantial. Moreover, the petitioner did not maintain books of account from which his farm profit or loss could be ascertained. He did not even file a schedule F, Farm Income and Expenses, for any of the years in issue. There is no evidence that he issued W-2 forms or kept payroll records regarding any farm employees. While the petitioner undoubtedly engaged in some farming, the manner in which he did so indicates his lack of an honest and actual profit objective. See sec. 1.183-2(b)(1), Income Tax Regs.
The petitioner also claims that he intended to realize an overall profit from farming operations when the appreciation of his farm land was accounted for. Sec. 1.183-2(b)(4), Income Tax Regs. Yet, he offered little evidence to substantiate his claim. He testified that he sold the Bullock *664 Creek property at a profit after 1972 and that he believed that "cheap" land was the best investment. However, such testimony was vague and general and was not supported by any specific information. If the petitioner's primary objective in acquiring and maintaining the farm land was to realize a profit on its appreciation, he could have better achieved such objective by discontinuing the farming operations. He cannot avoid section 183 and deduct large losses simply by conducting unprofitable farming activities on land that is appreciating independently or in spite of such activity. Where land is held primarily for appreciation, section 1.183-1(d)(1), Income Tax Regs., provides that if the income derived from farming the land does not exceed the deductions attributable thereto (other than the deductions attributable to the costs of holding the land), then the farming and the holding of the land are separate activities. Consequently, the expectation of appreciation of the land is not considered as a factor in determining whether the farming was an activity engaged in for profit. [11] In the present case, the petitioner's farming expenses far exceeded his farm income. Accordingly, *665 any expectation of appreciation which the petitioner may have had is irrelevant in determining whether the petitioner engaged in the activity of farming for profit. He seeks to avoid that conclusion by arguing that his expectation of appreciation was subsidiary to his objective of realizing a profit from farming operations. Such contention is utterly without support in the record. An examination of the remaining factors makes abundantly clear the fact that the petitioner was not farming for profit. He was an attorney with no particular expertise in the business and scientific practices involved in farming or cattle breeding.There is no evidence that he attempted to acquire such expertise before embarking on his farm ventures, nor that he hired employees possessing such knowledge. There is no evidence that the petitioner inquired into the profitability of other South Carolina cattle ranches. See sec. 1.183-2(b)(2), (b)(5), Income Tax Regs. The petitioner has a full-time law practice; it is reasonable to infer that his participation in farming *666 activities was limited. Such fact would not necessarily indicate a lack of a profit objective if the petitioner hired competent farm managers, but he introduced no evidence regarding the skills of his farm employees. Sec. 1.183-2(b)(3), Income Tax Regs. The farms lost substantial amounts of money during each of the years in issue. Sec. 1.183-2(b)(6) and (7), Income Tax Regs. Moreover, the petitioner's subsequent sale of the Bullock Creek farm belies his assertion that such losses were regarded by him as "start-up" losses, since he did not hold the property long enough to turn a profit from farming. He earned substantial income from his law practice during the years in issue ( sec. 1.183-2(b)(8), Income Tax Regs.); thus, he did not have to depend upon the farms for a profit, and the farm losses, if deductible, would be mitigated by the tax savings. Finally, the testimony of those witnesses who visited the farms reveals that they served as entertainment facilities for the petitioner and his family and friends. His guests dined, attended parties, and rode horses on the farms. The fact that the petitioner occasionally did farm labor does not change the primarily recreational nature *667 of the farms. Sec. 1.183-2(b)(9), Income Tax Regs. We conclude that the petitioner's farming activity was not engaged in for profit. Thus, the petitioner is not entitled to deductions for the farm losses for any of the years in issue. [12] *668 In the alternative, the petitioner asserts that he is entitled to deduct the costs of operating the farms as entertainment facilities directly related to or associated with the active conduct of his law practice. During the years in issue, the deductibility of the expenses of maintaining a business entertainment facility was governed by section 274. [13] Such section provided that no deduction was allowable with respect to a business entertainment facility unless the taxpayer established, inter alia, that the facility was "used primarily for the furtherance of the taxpayer's trade or business." Regulations promulgated under section 274 provided that the determination of primary use was to be made in light of all the facts and circumstances, with special emphasis on how the facility was actually used. Sec. 1.274-2(e)(4)(i), Income Tax Regs. The regulations also provided that the taxpayer would be deemed to have passed the primary *669 use test if he established that more than 50 percent of his use of the facility during the taxable year was business use. Sec. 1.274-2(e)(4)(iii), Income Tax Regs. Finally, section 274(d) provided the method by which the taxpayer was to establish that the facility was used primarily for the furtherance of his trade or business. Section 1.274-5(c)(6)(iii), Income Tax Regs., provided that the taxpayer was required to maintain records of the business and personal use of the facility. Records of business use were required to contain the date and business purpose of each entertainment and the name and occupation of each person entertained. The petitioner has utterly failed to prove that the farms were used primarily for the furtherance of his law practice. He kept no records of his business or personal use of the farms. The only evidence presented regarding this issue was Mr. Howard's testimony that the petitioner sometimes entertained attorneys, insurance adjusters, *670 bankers, real estate people, and public officials at the farms. This evidence may mercifully be described as inadequate. Accordingly, we hold that the petitioner is not entitled to any deductions for the expenses of operating his farms. The fifth issue for decision is whether the petitioner is entitled to employ income averaging for the taxable years 1969, 1970, and 1971. He elected to income average on his income tax returns for 1970 and 1971. In his brief, he contended that he is also entitled to income average for 1969. The Commissioner argues that the petitioner is not entitled to employ income averaging for any taxable year. [14]
If a taxpayer claims income averaging for a year (the computation year), it is necessary to determine the taxpayer's correct taxable income, not merely his reported taxable income, for each base period year. Secs. 1301 through 1305; Unser v. Commissioner,59 T.C. 528 (1973). *671 The base period years are the four taxable years immediately preceding the computation year. Sec. 1302(c)(2). The petitioner bears the burden of establishing the correct taxable income for each base period year. Rule 142(a); Welch v. Helvering,supra.[15] Copies of the petitioner's income tax returns for 1965 through 1968 were stipulated and admitted into evidence. The Commissioner asserts that, since the petitioner began cashing insurance checks in 1968, he understated his taxable income on his return for that year, just as he did on his returns for 1969 through 1972. The Commissioner argues that since there is no other evidence from which the petitioner's correct taxable income for 1968 can be determined, the petitioner has failed to prove his correct taxable income for that year.The Commissioner concludes that, since 1968 is a base period year for each of the taxable years 1969, 1970, and 1971, the petitioner is not entitled to employ income averaging for such years. The petitioner concedes that *672 his reported taxable income for 1968 is incorrect, but contends that his correct taxable income may be determined through an analysis of the insurance checks cashed by him in 1968. He argues that his correct taxable income may be determined by adding 30 percent of the total face amount of such checks to the taxable income reported on his tax return for 1968. However, there is no evidence that the schedule of insurance company checks relied upon by the petitioner reflects all the insurance checks cashed by him. More importantly, the schedule only reflects insurance checks cashed by the petitioner. The petitioner employed two associates in 1968 under a fee-sharing arrangement; the associates often paid the petitioner his share of their fees in cash. The petitioner has not proved the amount of the cash fees he received from his associates in 1968. Thus, he has failed to establish his correct taxable income for 1968, and he is precluded from employing income averaging for 1969, 1970, and 1971.
On his return for 1972, the petitioner claimed unmarried head of household filing status and elected the maximum tax. In his notice, the Commissioner determined that the petitioner's correct *673 filing status for 1972 was married filing separately. The petitioner did not challenge such determination in his petition and has thereby conceded the correctness of the Commissioner's determination of his filing status. Rule 34(b)(4). Thus, the petitioner is not entitled to elect the maximum tax for 1972. Sec. 1348(c). [16]
Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue.↩
2. The parties stipulated that Mr. Olive made the downpayment on the Wellesley Avenue property with an NCNB money order for $22,000. However, since Mary provided $11,673 of such payment, the parties have stipulated that the portion provided by her was not a source of taxable income to Mr. Olive, and the Commissioner has made an appropriate adjustment in his computation of Mr. Olive's cash expenditures.↩
3. To avoid the possibility of counting certain deposits twice or of counting income earned prior to the years in issue, it is necessary to eliminate checks payable to Mr. Olive or to cash if the proceeds of such checks were included in the sum of bank deposits and cash expenditures. If the source of the check was prior years' deposits, then a deposit or expenditure of its proceeds did not result from income earned during the years in issue. If the source of the check was a deposit made during the years in issue, then its proceeds have already been included in the computation as a deposit. Here, the Commissioner apparently gave Mr. Olive the benefit of the doubt, reducing the sum of bank deposits and cash expenditures by all checks payable to him or to cash in excess of $1,000. This adjustment relieved Mr. Olive of his burden of proving that the deposits or expenditures of the proceeds of such checks were in fact included in the sum of bank deposits and cash expenditures.
4. The parties have since stipulated that, if such an adjustment is to be made at all, it is only to be made for the taxable year 1972 in the amount of $10,450.99. ↩
5. These amounts do not reflect concessions and stipulations made after the issuance of the notice.↩
6. Kane v. Commissioner,T.C. Memo. 1959-111↩. 7. All references to a Rule are to the Tax Court Rules of Practice and Procedure.
8. In his reply, the petitioner admitted that he paid Mary the amounts determined by the Commissioner. Accordingly, we have found as facts that he made those payments to her.↩
9. See note 3, supra.↩
10. See Adler v. Commissioner,T.C. Memo. 1968-100, affd. 422 F. 2d 63↩ (6th Cir. 1970), where we held that the failure of the Commissioner to include an adjustment for the difference in the opening and closing balances of the accounts receivable of the accrual-method petitioner caused a distortion of income as reconstructed by the bank deposits and cash expenditures method.
11. LaMusga v. Commissioner,T.C. Memo. 1982-742; Tarutis v. Commissioner,T.C. Memo. 1982-313; Hambleton v. Commissioner,T.C. Memo. 1982-234↩.
12. The parties assumed that sec. 183 was applicable to 1969. In fact, that section was enacted by sec. 213 of the Tax Reform Act of 1969, Pub. L. 91-172, 83 Stat. 571, and was made applicable to taxable years beginning after Dec. 31, 1969 (sec. 213(d), 83 Stat. at 572). However, substantially the same tests were applicable under the prior law ( Benz v. Commissioner,63 T.C. 375, 382-383 (1974); see Bessenyey v. Commissioner,45 T.C. 261, 273 (1965), affd. 379 F. 2d 252 (2d Cir. 1967); Sabelis v. Commissioner,37 T.C. 1058 (1962)), and accordingly, we have applied sec. 183 to 1969 as well as to the other years at issue. Furthermore, the parties did not argue the extent of the deduction for farm losses which the petitioner should be allowed under the limitations of sec. 183(b). However, we observe that the interest on the unpaid portions of the purchase price of the farms which the petitioner deducted on his returns for each year, and which he was entitled to deduct under sec. 183(b)(1) without regard to his profit objective, exceeded the farm gross income which he reported each year.Thus, under sec. 183(b)(2), he was not entitled to a deduction in any amount↩ for his losses from farm operations.
13. Sec. 274 (a)(1)(B) was amended by sec. 361(a) of the Revenue Act of 1978, Pub. L. 95-600, 92 Stat. 2847, to disallow entirely deductions relating to entertainment facilities for taxable years ending after Dec. 31, 1978.↩
14. The Commissioner did not challenge the petitioner's right to claim income averaging for 1969 on the ground that he first presented such claim in his brief. Accordingly, we will deal with the petitioner's claim for that year on its merits and will not reject it because it was presented too late.↩
15. Bianco v. Commissioner,T.C. Memo. 1982-186; Venditti v. Commissioner,T.C. Memo. 1981-390; Abernathy v. Commissioner,T.C. Memo. 1978-370; Ryza v. Commissioner,T.C. Memo. 1977-64↩.
16. Sec. 1348 was repealed for taxable years beginning after Dec. 31, 1981, by sec. 101(c), Economic Recovery Tax Act of 1981, Pub. L. 97-34, 95 Stat. 183.↩