T.C. Memo. 2001-100


UNITED STATES TAX COURT


DANIEL E. AND KAREN A. HARKINS, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 15623-99.                          Filed April 26, 2001.


<u>Tim A. Tarter</u>, for petitioners.

<u>John W. Duncan</u> and <u>Ann M. Welhaf</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, <u>Judge</u>:  Respondent determined a deficiency of

$111,311 in petitioners' 1996 Federal income tax.  After various

concessions,[1] the issues presented to us are (1) whether

_____

[1] We summarily describe certain concessions not discussed
in the Findings of Fact.  Petitioners stipulate that they must
include in income $8,658 for fringe benefits received from
Harkins Amusement Enterprises, Inc. (in the form of paid medical
insurance premiums), while respondent allows a partially
offsetting health insurance deduction of $2,597 for self-employed
                                                   (continued...)

petitioners must report as income in 1996 amounts paid during 1996 by Pepsi-Cola Co. (Pepsi) to Daniel E. Harkins' (Mr. Harkins') solely owned S corporation and (2) whether petitioners must report as income in 1996 amounts paid in 1997 by Pepsi which are associated with the S corporation's activities in 1996. Because the S corporation reports its income on the accrual method of accounting, we evaluate the above issues within the context of sections 446 and 451 and the regulations thereunder.[2]

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. At the time they filed their petition, petitioners' residence was in Paradise Valley, Arizona.

Mr. Harkins operates various motion picture theaters throughout the State of Arizona, most of which are located in the greater Phoenix area. He conducts his movie theater business through Harkins Amusement Enterprises, Inc. (the theater

---

[1](...continued)
individuals. As to certain Schedule E, Supplemental Income and Loss, income determined and deductions disallowed by respondent, petitioners concede that they have additional income of $5,195 and that they are not entitled to deductions of $55,744 for rent and $46,478 for repair and maintenance. Respondent concedes that $7,941 in interest income is not subject to taxation.

[2] Section references are to the Internal Revenue Code in effect for 1996, and all Rule references are to the Tax Court Rules of Practice and Procedure.

company), a corporate entity incorporated under the laws of Arizona and classified for tax purposes as an S corporation. See secs. 1361-1363. During the year in issue, the theater company used the accrual method of accounting to report its income and expenses. Because the theater company is classified as an S corporation for Federal income tax purposes, the income and expenses reported by the theater company flow through to petitioners' personal tax return. See sec. 1366.

At the time of trial, the theater company operated 19 movie theaters with a total of 198 movie screens. Along with providing motion picture entertainment, the theater company sells food and beverages at snack bars located inside its movie theaters. In order to generate significant and consistent revenues from its food services, Mr. Harkins, as president of the theater company, entered into an agreement with Pepsi to purchase postmix products for use in preparing Pepsi brand soft drinks.[3] Among other requirements, the theater company agreed to purchase Pepsi paper cups, Pepsi compressed $CO_2$, and certain equipment used in the preparation of fountain soft drinks. The term of the agreement

---

[3] The theater company did not generally sell any premixed and prepackaged Pepsi products (i.e., Pepsi-brand bottles or cans generally available to the public at stores and supermarkets). There is an indication in the record, however, that the theater company sold Aquafina, Pepsi-brand bottled water.

commenced on January 1, 1995, and extended through January 1, 2000.[4]

As part of the agreement, Pepsi agreed to provide certain monetary support to the theater company based upon its purchases of Pepsi products.  Pepsi agreed to pay 65 cents for each gallon of postmix product purchased by the theater company.  The parties designated this type of incentive as flex funds.  The agreement provided:

### NATIONAL ACCOUNT PRICES AND FLEX FUND ALLOWANCES

*     *     *     *     *     *     *

> All standard flex funds will accrue on a semi-annual
> basis and will be paid to the Customer accordingly.
> The Customer will receive all $.65 per gallon under the
> flex fund program, which will be deemed earned by the
> Customer upon payment by Pepsi-Cola of the Flex Funds
> to the Customer.

Pepsi also provided marketing support to the theater company at the rate of $2.05 for each gallon of postmix product purchased. The parties designated these funds as marketing funds and provided as follows:

### MARKETING FUND

> During each year for the Term of this Agreement, Pepsi-
> Cola will accrue a marketing fund ("the Marketing
> Funds") at the rate of $2.05 per gallon on all Postmix
> Products purchased by the Customer during each year.
> Pepsi-Cola will pay these Funds to the Customer each
> year <u>within 60 days after the completion of each 6-
> month period</u>, starting from the anniversary date and

---

[4]  At the time of trial, Mr. Harkins was negotiating a new agreement with Pepsi.

continuing through the end of the Term.  The intent of this support is to provide financial support to aid in the development of marketing programs that provide mutual benefit to both the Customer and Pepsi-Cola, and to support the costs associated with the Customer's compliance with marketing requirements outlined in the Performance paragraph below.

The Marketing Funds will be deemed to be earned only if the Customer is in full compliance with all of the requirements set forth in the Performance Paragraph below for that entire Year.  Should the Customer fail to comply with any of the Performance Requirements during the Term, the Customer agrees that in addition to the forfeiture of any funding for the second 6-month period, the Customer shall immediately repay to Pepsi-Cola all of the funds paid to the Customer, by Pepsi-Cola, for the first 6-month period of that Year. [Emphasis added.]

In exchange for the right to receive the flex and marketing funds, the theater company agreed to the following performance criteria (which dealt with obligations to exclusively purchase, sell, and advertise Pepsi-brand products):

<u>PERFORMANCE</u>

This Agreement, including all of Pepsi-Cola's support to the Customer as described above [the flex funds and the marketing funds], is contingent upon the Customer's complying with all of the following performance criteria, with which the Customer hereby agrees to comply with as follows:

1. The Customer agrees that exclusively Pepsi-Cola supplied Soft Drink Products shall be served throughout the Term of this Agreement in each of the Customer's outlets:  Pepsi-Cola, Diet Pepsi-Cola, Caffeine Free Diet Pepsi, Mountain Dew, Lemon Lime Slice, Mandarin Orange Slice, Wild Cherry Pepsi and Dr. Slice.

2. The Customer shall purchase only Pepsi-Cola supplied, Pepsi brand identified paper cups.  If the Customer chooses to design a custom cup, at

least one full vertical panel (or equivalent thereof, subject to the prior written consent of Pepsi-Cola) shall contain the Pepsi-Cola logo. All incremental costs to include artwork, art changes and custom cup development, will be the responsibility of the Customer.

3.   Beginning in 1996, and each subsequent Year thereafter, for the Term of this Agreement, at least one full vertical panel on the Customer's 32oz plastic refill cup (or equivalent thereof, subject to the prior written consent of Pepsi-Cola) shall contain the Pepsi-Cola logo.  Should the Customer elect to trade out or sell a panel to another partner/vendor/supplier, the Customer agrees that production of said cup must be with the mutual approval of the Customer and Pepsi-Cola.

*     *     *     *     *     *     *

10.   The Customer shall provide to Pepsi-Cola upon the execution of this Agreement a list of all outlets in the Customer's system.  The Customer agrees that it shall promptly notify Pepsi-Cola in writing of each new outlet in the Customer's system which is opened or acquired during the Term, as well as any outlet which is closed, sold or otherwise disposed of during the Term.

Finally, in a closing section of the agreement, the parties

agreed:

<u>CLOSING PARAGRAPHS</u>

If for any reason the Customer fails to comply with any of the terms of this Agreement, the Customer agrees that, in addition to any other remedies to which Pepsi-Cola may be entitled by reason of such breach, the Customer shall immediately repay to Pepsi-Cola all funding previously paid by Pepsi-Cola but not earned by the Customer pursuant to the terms of this Agreement.

Pepsi paid the flex and marketing funds associated with the first half of 1996 (generally, January 1 to June 30) in 1996.[5] The flex and marketing funds relating to the last half of 1996 (generally, July 1 to December 31) were paid by Pepsi in 1997. On its 1996 tax return, the theater company reported in income only the flex and marketing funds paid in 1996.

Respondent determined that the flex and marketing funds paid in 1997, which related to the latter half of 1996, should have been accrued by the theater company in 1996 as income and included on its 1996 tax return. In their petition, petitioners averred that the theater company did not have to accrue for 1996 any of the payments made in 1997 or 1996. Respondent now concedes that petitioners did not have to report as income the flex funds for the last half of 1996 which were paid in 1997. Respondent still contends that the marketing funds for the latter half of 1996 which were paid in 1997 should have been accrued by the theater company in 1996 and included in petitioners' 1996 tax return. Respondent maintains that the payments made in 1996 with respect to the first half of that year were properly reported on the theater company's and petitioners' 1996 tax returns.

---

[5] The parties stipulate that the flex funds for the first half of 1996 accounted for the period beginning Jan. 4, 1996, and ending June 14, 1996. The parties do not provide any explanation for this departure from the agreement.

OPINION

I.  Evidentiary Issue

At trial, respondent objected generally to the proposed testimony of Ron Goodson, a general manager from the Pepsi-Cola Bottling Group of Arizona.  Petitioners presented his testimony for the purpose of addressing and interpreting certain terms in the agreement.  Respondent argued that Mr. Goodson's testimony was an attempt by petitioners to vary or contradict the written terms of the agreement in violation of Arizona's parol evidence rule.  Petitioners, on the other hand, contended that Mr. Goodson was to testify in a manner consistent with the agreement, and therefore the introduction of parol evidence for the purpose of interpreting the intent of the parties was proper under Arizona law.

The Court allowed Mr. Goodson to testify conditionally for the purpose of evaluating whether his testimony would be in conflict with Arizona's parol evidence rule and reserved ruling on respondent's objection.  We briefly describe Mr. Goodson's relevant testimony.

Mr. Goodson testified that during the 60-day period following the end of each 6-month period of the agreement, Pepsi investigated whether the theater company was in compliance with the agreement.  He, however, described only the investigation

undertaken by Pepsi at the end of each calendar year.[6]  Mr. Goodson explained that only if Pepsi, after conducting the investigation, considered the theater company to be in compliance with the agreement would Pepsi then pay the flex and marketing funds to the theater company.  He also explained that Pepsi believed that it could recover any flex or marketing funds previously paid if Pepsi considered the theater company to have breached the agreement.  We now rule on respondent's objection.

Under Arizona's parol evidence rule, a judge "first considers the offered evidence and, if he or she finds that the contract language is 'reasonably susceptible' to the interpretation asserted by its proponent, the evidence is admissible to determine the meaning intended by the parties." Taylor v. State Farm Mut. Auto. Ins. Co., 854 P.2d 1134, 1140 (Ariz. 1993).  The judge, however, must still exclude extrinsic evidence which would vary or contradict the meaning of the written agreement.  See id.

We believe that certain parts of Mr. Goodson's testimony are properly admissible for the purpose of interpreting the rights and obligations of the parties under the agreement.  We also believe that other parts of Mr. Goodson's testimony are inadmissible as they contradict or vary the parties' agreement as

---

[6]  Mr. Goodson testified that the investigation could take up to 180 days.

written.  We therefore do not consider the parts of Mr. Goodson's testimony which are inadmissible in deciding the issues before us.  For simplicity, we set out and refer to Mr. Goodson's admissible and nonadmissible testimony below as we evaluate the written language of the agreement.

II.  The All Events Test

A taxpayer may use the accrual method of accounting to report income.  See secs. 446(a), (c), 451(a).  If the taxpayer elects to report its income in that manner, the taxpayer must report income in the year in which "all the events have occurred which fix the right to receive such income and the amount thereof can be determined with reasonable accuracy."  Sec. 1.451-1(a), Income Tax Regs.; see also sec. 1.446-1(c)(1)(ii)(A), Income Tax Regs.  Generally, all the events that fix the right to receive income occur on the earliest of the following:  (1) The date payment is received; (2) the date payment is due; or (3) the date of performance.  See Schlude v. Commissioner, 372 U.S. 128 (1963); Johnson v. Commissioner, 108 T.C. 448, 459 (1997), affd. in part, revd. in part and remanded on another ground 184 F.3d 786 (8th Cir. 1999); Firetag v. Commissioner, T.C. Memo. 1999-355.

In addition, when applying the all events test, we consider conditions precedent, which are required to be met before a fixed right to receive income exists, but disregard conditions

subsequent, which may terminate an existing right to income but the presence of which does not preclude the accrual of income. See Keith v. Commissioner, 115 T.C. 605, 617 (2000); Charles Schwab Corp. & Subs. v. Commissioner, 107 T.C. 282, 293 (1996), affd. 161 F.3d 1231 (9th Cir. 1998). Having stated the boundaries of the all events test, we now turn to the parties' contentions.

III. The Parties' Contentions

As to the flex and marketing funds paid by Pepsi during 1996 (for the first half of 1996) and which the theater company reported as income on its 1996 tax return, petitioners now argue that those payments were refundable deposits not subject to accrual in 1996. Petitioners cite Commissioner v. Indianapolis Power & Light Co., 493 U.S. 203 (1990), for the proposition that a taxpayer does not have to accrue payments over which he does not have complete dominion and that complete dominion occurs only when the taxpayer has some guaranty of retaining the funds at issue. Petitioners argue that because the theater company was obligated to repay the payments for the flex and marketing funds in the event of a breach by the theater company occurring as late as "after year end (e.g., March 1997)", the theater company did not enjoy complete dominion over the payments during 1996 and therefore did not have to accrue them. Petitioners contend that the theater company enjoyed complete dominion over the funds

received in 1996 only after Pepsi performed its investigation in 1997 (i.e., only after Pepsi decided to approve payment).

With regard to the marketing funds payment in 1997 for the last half of 1996, petitioners reiterate that under the agreement, Pepsi had 60 days from the end of 1996 to determine whether the theater company had complied with the performance criteria of the agreement.  Petitioners therefore implicitly argue that only after Pepsi had conducted its review and established for itself that the theater company was entitled to the funds did the theater company have a fixed right to receive that income.

Respondent disagrees with petitioners that the flex and marketing funds paid in 1996 constitute refundable deposits and instead considers the payments as advances subject to accrual in 1996.  As to petitioners' other contentions, respondent counters that by the close of 1996, the theater company had performed all outstanding obligations required under the agreement to accrue the marketing funds paid in 1997.  Specifically, respondent argues that the agreement did not call for a review or investigation by Pepsi--it called only for the theater company's performance.

IV.  Deposits Versus Advances

In Commissioner v. Indianapolis Power & Light Co., supra, the Supreme Court dealt with the issue of whether certain

payments constituted refundable deposits not subject to inclusion in income versus advance payments subject to accrual.  As to petitioners' argument that the theater company did not have complete dominion over the payments made in 1996 until sometime in 1997, the test of whether a taxpayer has "complete dominion" over payments centers on "whether the taxpayer has some guarantee that he will be allowed to keep the money."  Id. at 210.  Indeed, the Supreme Court remarked that the "individual who makes an advance payment retains no right to insist upon the return of the funds; so long as the recipient fulfills the terms of the bargain, the money is its to keep."  Id. at 212.  In evaluating whether a taxpayer enjoys complete dominion, we look to "the parties' rights and obligations at the time the payments are made."  Id. at 211.

Petitioners ignore that when the 1996 payments for the flex and marketing funds were made, the theater company, under the agreement, had in essence a guaranty that it could retain the funds as long as it performed according to the agreement.  For purposes of the accrual method, the theater company's right to the flex and marketing funds was not contingent on Pepsi's investigating the theater company's compliance with the agreement or approving the funds.  Therefore, the theater company's obligation (if any) to repay the funds as a result of not performing according to the agreement did not convert the funds

into refundable deposits or preclude their accrual as income.

Pursuant to Arizona's parol evidence rule and Mr. Goodson's testimony, we accept petitioners' argument that Pepsi generally conducted an investigation during the 60-day period following the end of each calendar year. This part of Mr. Goodson's testimony is consistent with the agreement in which Pepsi had 60 days to pay the marketing funds following the end of each 6-month period.[7]

We, however, reject petitioners' contention that the theater company's right to the funds was dependent on Pepsi's approving the funds, for it would require us to read a provision into the agreement. The agreement simply states that the flex and marketing funds were "contingent upon the Customer's complying with * * * the * * * performance criteria". Because the theater company had a guaranty of retaining the flex and marketing funds as long as it performed under the agreement, we do not consider the flex and marketing funds paid in 1996 to be refundable deposits as suggested by petitioners.[8]

---

[7] The agreement did not explicitly provide that Pepsi had 60 days at the end of each 6-month period to pay the flex funds.

[8] As to respondent's argument that the flex funds paid in 1996 for the first half of that year constituted advance receipts, we note that the agreement provided that flex funds were "earned" when paid; that provision could lead to the conclusion that at the time the flex funds were received in 1996, they were receipts on account of actual rather than expected performance. See infra note 9 for our interpretation of the word
(continued...)

V.   <u>Marketing Funds Paid in 1997</u>

We now turn to the issue of whether the marketing funds paid in 1997 (for the last half of 1996) were subject to accrual under the all events test in 1996.  As to this payment, petitioners contend that the theater company did not have a fixed right to the marketing funds until Pepsi performed its review of whether the theater company had complied with the agreement (i.e., sometime during the 60 days after the end of 1996).

With respect to every calendar year during the term of the agreement, Pepsi agreed to provide the theater company marketing funds based upon the amount of Pepsi products purchased during each respective year.  The marketing funds, however, were paid semiannually and due from Pepsi within 60 days after the completion of every 6-month period of each year.  The marketing funds related to each year were considered earned under the agreement only if the theater company was in full compliance with the performance requirements listed in the agreement during the entire year.[9]  Entitlement to the marketing funds, we have already concluded above, was not contingent on Pepsi's approving the marketing funds, even though Pepsi had 60 days from the close

----

    [8](...continued)
"earned".

    [9]  We interpret the parties' usage of the word "earned" as addressing when the theater company was entitled to those funds under the agreement and not as a technical term addressing the accrual of income for Federal tax purposes.

of the calendar year to make the payment related to the marketing funds for the last half of the calendar year. The right to the marketing funds simply depended on the theater company's performing as provided in the agreement during 1996.

There is no evidence in the record indicating that the theater company did not perform as called for in the agreement during the 1996 tax year. Mr. Harkins, as president of the theater company, was in the best position to know the state of his business by the end of 1996. He had control of all the records and information related to the theater company. At trial, he did not indicate any circumstances occurring by the end of 1996 inconsistent with the theater company's performance obligations under the agreement.[10] Therefore, because the theater company had performed in 1996 as provided for in the agreement, the payment made in 1997 for the marketing funds for the last half of 1996 should have been accrued in 1996.

Petitioners additionally argue that if the theater company had failed to perform on the agreement during the 60-day period

---

[10] Mr. Harkins did testify that on one occasion, the machine used to produce fountain soft drinks at one of his movie theaters had stopped working. In order to provide customers with soft drinks, a movie theater manager had purchased "Coke" bottles (by accident) at a local store. When Mr. Harkins arrived at the movie theater, he immediately told the manager to remove the "Coke" bottles from the movie theater. Mr. Harkins did not indicate whether this incident occurred in 1996, and petitioners do not cite this incident as a basis for nonperformance on the agreement.

after the close of the 1996 taxable year, the period reserved to
Pepsi for making payment of the marketing funds for the second
half of 1996, the theater company would have been forced to
forfeit the marketing funds for the last half of 1996 and to
repay the marketing funds for the first half of 1996.
Petitioners therefore contend that the theater company's right to
the marketing funds remained contingent even after the close of
the taxable year.  Petitioners base their contention on the
provision in the agreement labeled "Marketing Fund":

> Should the Customer fail to comply with any of the
> Performance Requirements during the Term, the Customer
> agrees that in addition to the forfeiture of any
> funding for the second 6-month period, the Customer
> shall immediately repay to Pepsi-Cola all of the funds
> paid to the Customer, by Pepsi-Cola, for the first 6-
> month period of that Year.  [Emphasis added.]

As previously stated, however, we do not look to conditions
subsequent in applying the all events test.  See Keith v.
Commissioner, 115 T.C. at 617.  We therefore sustain respondent's
determination that the marketing funds paid in 1997 should have
been accrued in 1996.

To the extent not herein discussed, we have considered the
parties' other arguments but found them to be moot, irrelevant,
or unconvincing.

To reflect the foregoing,

Decision will be entered

under Rule 155.