# United States Tax Court

T.C. Memo. 2025-105

ARMOND GARIBYAN, ET AL.,[1]
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket Nos. 7835-20, 7836-20,          Filed October 9, 2025.
7837-20, 7741-21.

————

*Aksel Bagheri*, for petitioners.

*Joanne H. Kim*, *Sharon Y. Tang*, and *Jordan S. Musen*, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, *Judge*:  Armond and Arsen Garibyan are brothers who started Lakeview Hospice Care, Inc.  The hospice business depends for its income almost entirely on third parties, usually private and public insurers.  The Garibyans adopted the accrual method of accounting for Lakeview's books.  Their problem is that Lakeview's corporate ledger rarely showed income and expenses as they accrued during the year.  The Commissioner audited Lakeview's and then the Garibyans' individual returns.  He combed through their bank records for the 2015 and 2016 tax years and concluded that Lakeview had underreported its gross income by more than $200,000; and that Armond underreported his income for both years too.[2]  The parties also dispute the

————

[1] We consolidated Arsen Garibyan, Docket No. 7836-20, Lakeview Hospice Care, Inc., Docket No. 7837-20, and Armond Garibyan and Ani Garibyan, Docket No. 7741-21, with this case.

[2] The Commissioner and Arsen settled their differences.


**Served 10/09/25**

**[\*2]** Commissioner's disallowance of more than $450,000 in deductions for Lakeview.

Lakeview and the Garibyans say these bank deposits analyses overstate their income. They also contest the disallowance of Lakeview's deductions.

## FINDINGS OF FACT

I.    *Lakeview's Origins*

A high school graduate who dropped out of college, Armond Garibyan was what he describes as a "glorified life insurance agent" in a past life, although he was in fact licensed as an insurance agent by California's Department of Insurance. He also held officer and board positions with five California business entities, including a barber shop and various marketing and consulting companies.

Armond's younger brother, Arsen, also has a background in the insurance business. He was a licensed insurance agent in California and worked for Ellion Financial and Insurance Services, Inc. He was also a serial entrepreneur, who co-owned the barber shop and was a shareholder and officer in two other California corporations unrelated to the hospice industry.

In 2008, Armond started talking to a neighbor who was a consultant for the hospice industry, and they hit it off because Armond himself had an interest in healthcare. Shortly thereafter, Armond and Arsen founded Lakeview as a California C corporation.[3]

Lakeview's office is in Burbank, California. Armond is Lakeview's administrator and oversees its payroll expenses and staffing. He also deals with Medicare and the various regulatory agencies that oversee the hospice industry. Arsen runs the firm's marketing department. Armond married his wife, Ani, in 2016 and brought her into the business. Both Armond and Ani as well as Arsen reside in Glendale, California.

---

[3] A "C corporation" is a corporation that is taxed under subchapter C of chapter 1 of the Internal Revenue Code, sections 301–385. (Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (Code), in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure.)

[*3]   Lakeview's business was closely tied to employees outside of the Garibyan family, though.  Dr. Nicholas Jauregui was a 51-percent shareholder of Lakeview by way of Kephas MSO, which was one of the corporations that he controlled and that received payments from Lakeview.  He was also Lakeview's medical director.  (California requires hospices to have medical directors.)  In this role, Jauregui oversaw all clinical operations because Lakeview's other employees didn't deal directly with patients' doctors.  Jauregui signed off on all the patients' clinical orders.

Two other Lakeview employees, a husband-and-wife team, helped bring in new patients.  But in late 2014, they left Lakeview and started their own hospice agency.  Lakeview lost patients and revenue.  There was real doubt about whether it would survive.

But this case is about the dry bones of tax accounting, and if we are to reanimate them, we must first explain how the for-profit hospice industry works in California.

II.   *The Hospice Business*

Hospice agencies care for terminally ill patients.  California requires hospice agencies to be licensed by the California Department of Public Health, which requires an application and a site visit to the hospice center.

Lakeview itself needed to complete what Armond described as a two-step application process.  In 2008 he rented an office for his administrative staff and submitted an application to the local health department.  Then he had to submit a license application to Medicare, which issued him a provider number allowing Lakeview to bill for patient reimbursement.  Waiting for his health-department license and Medicare provider number took Lakeview five years after its 2008 incorporation.  And that meant five years before it could begin receiving reimbursements.

A hospice agency must not only be licensed by California, it must also be certified and contract with insurance providers to be reimbursed for its services.  Neither hospice patients nor their families pay for hospice care.  Hospice agencies depend for their income on insurers: Medicare (the federal program which is the largest payor of hospice services nationwide), Medi-Cal (California's Medicaid program for the poor), and patients' private insurers.

**[*4]**  Like many industries with overlapping government and third-party involvement, the feds' procedures dictate much of how hospice businesses operate.  The U.S. Centers for Medicare and Medicaid Services must verify that an agency meets its requirements before Medicare money can flow.  These include certifying that a patient is "terminally ill," which is a determination made by a physician.[4]  Each determination lasts 90 days but can be renewed.  A hospice that cares for a certified patient can then receive daily rates while that patient is in its care.

These were the federal daily rates in the Los Angeles area during the years at issue:[5]

| Tax Year | Routine Home Care (per Day) Days 1–60 | Routine Home Care (per Day) Days 61 and Beyond | Continuous Home Care (per Hour) | Inpatient Respite Care (per Day) | General Inpatient Care (per Day) |
|---|---|---|---|---|---|
| 2015 | $187.07 | — | — | $187.41 | $823.69 |
| 2016 | 217.96 | 171.29 | $45.92 | 189.42 | 831.84 |

Medi-Cal used similar daily rates but allowed patients to be certified at six-month intervals.  In California, hospice patients can have both Medicare and Medi-Cal.  Medi-Cal pays for room and board at nursing homes and similar facilities, which Medicare does not.  And patients without Medicare or Medi-Cal must pay for hospice care and room-and-board expenses by themselves, typically with private health insurance.

Hospice agencies such as Lakeview do not typically provide a physical location for their patients.  Many of Lakeview's patients, for example, live in nursing homes or similar institutions.  Once a patient is certified as terminally ill, the institution is no longer allowed to bill insurers directly. They must instead start "pass-through billing," which means the nursing facility bills the hospice agency for a patient's room-and-board expenses.  Agencies like Lakeview then bill the insurer—Medi-Cal or a private insurance company—for these expenses.  The hospice agency then has to reimburse the nursing facility.

---

[4] When electing to receive hospice care under such a certification, patients are foregoing treatment of their terminal illness and certifying that Medicare will no longer pay for their treatment.

[5] When the daily rates were not available in the record, we used an em dash.

**[*5]** This meandering cashflow can take a while to reach its destination. And that's not the only cashflow problem hospice agencies must solve. Agencies such as Lakeview typically receive a fixed daily payment for their patients, out of which they must pay variable patient expenses such as medication, medical equipment, nurses, chaplains, social workers, and therapists. While there are some economies of scale to be had by an agency's formulary deal with a pharmacy for medications, a hospice agency that spends more on a patient than it receives from these daily rates will lose money. One can easily see why accurately tracking reimbursements and expenses is crucial to a hospice business's survival.

III.    *Lakeview's Accounting*

    A.    *Patient Data Entry*

Lakeview received income from only Medicare, Medi-Cal, and private health-insurance companies; none of its patients paid out-of-pocket for their care. And much of its Medi-Cal income came in the form of reimbursements to nursing homes for room and board. All of these reimbursements, medical care, and employees require copious data keeping.

When a patient was first referred to Lakeview, it received the patient's demographic information from the referring physician. Then its intake department formally requested the patient's medical records and inputted the patient's insurance and previous medical information into its system. A Lakeview nurse then assessed the patient and updated the medical records according to the assessment.

    B.    *Consolo and EHP Billing*

To keep track of all this essential data Lakeview subscribed to an electronic health records program called Consolo. This program assigned a unique medical record number for each patient. Lakeview's nurses and intake specialists inputted all patients' medical records, billing, revenue, and HIPAA[6] compliance information into Consolo.

---

[6] The Health Insurance Portability and Accountability Act of 1996 (HIPAA), Pub. L. No. 104-191, §§ 261–264, 110 Stat. 1936, 2021–34, contains privacy rules and gave rise to privacy regulations relating to individually identifiable health information.

[*6] Lakeview was assigned a representative at Consolo who generated monthly reports that detailed its patient and revenue data.

Consolo played a critical role in Lakeview's billing process. Lakeview contracted with EHP Billing (EHP), a third-party billing service, to provide invoices for Lakeview and bill insurance companies for Lakeview's services and its passthrough billing for nursing homes. Because EHP also runs on the Consolo platform, it was able to bill in compliance with HIPAA using Lakeview's Consolo data. Neither EHP, Armond, nor anyone else at Lakeview could alter Consolo's billing rates once they were entered into the program.

Lakeview paid Consolo a small percentage of its revenue to license the software. EHP also got a cut—it received 2% of what Lakeview billed to the government and insurance companies, with a cap of $5,000 a month. EHP itself could face a regulatory slap from Medicare if it found Lakeview wasn't billing the government correctly. The Garibyans argue that these incentives make EHP's and Consolo's records reliable enough that we should use them to compute Lakeview's gross revenue or, at the very least, an alternative source of information to derive Lakeview's income other than what they say is the Commissioner's flawed bank-deposits analysis.

C.   *Lakeview's Ledger*

Lakeview's use of Consolo and EHP seems to fall in line with the industry standard. But Lakeview's own internal recordkeeping is a different story. Only Armond and Arsen had authority to sign checks on behalf of Lakeview, but in practice Armond wrote and signed all the checks.

From its inception in 2008, Lakeview used Channels & Channels, Inc., an accounting firm located in the Orange County community of Costa Mesa, as its outside bookkeeper. Ron Channels, the firm's president, has more than 60 years of tax-preparation experience, but he isn't a CPA. He helped Armond set up Lakeview's bookkeeping system, although he didn't give Armond any advice on how to maintain books for a hospice business in particular.

He did, however, advise Lakeview to keep its books on an accrual system. An accrual-method taxpayer recognizes income when it is *earned. See Martin v. Commissioner*, 121 T.C.M. (CCH) 1237, 1241 (2021). Lakeview's fiscal year ran from October 1 through September 30.

[*7]   The Garibyans argue that Lakeview's general ledger follows the rule of accrual accounting.  Entries are divided into debits or credits, and include the name of the vendor or payor, the date, and the amount of payment.  But Lakeview's ledger also contained some oddities. At the beginning of its 2016 fiscal year, Lakeview reversed its accounts receivable from $110,975 to $0 without intervening entries to account for the reversal.   And it rarely debited accounts receivable every month—if at all—despite regularly receiving payments from insurance companies via EHP.

And then there was Armond's process for actually keeping track of the figures that needed to be put in the ledger.  When Lakeview received an invoice, he stamped the invoice as paid, dated it, and put it in a manila folder.  Armond described this system as simple yet suitable because he could keep track of Lakeview's relatively small number of vendors.   Armond scanned and emailed or physically delivered the invoices to Channels for him to keep Lakeview's books.

But whatever Armond and Channels were doing did not lead to an understandable ledger for Lakeview.  There were a large number of adjusting journal entries in Lakeview's general ledger between its two accounts payable.[7]  As an example, Lakeview reversed $106,490 in one of its accounts-payable balances in 2016 by just writing "Journal Entry" and "Reverse of Year End Accruals" in the ledger.  We found more than a dozen similar journal entries for that year.

The deficiencies in Lakeview's accounting would ultimately lead the Commissioner to analyze the firm's cash deposits and transfers in its bank accounts.  There were three of these, all at Wells Fargo (WF).  Armond and Arsen used one of these, WF #1732, primarily to track and pay Lakeview's expenses.  A second, WF #1740, tracked Lakeview's income.  The last WF account had minimal activity, and the parties agree that it received no taxable deposits during the years at issue.

---

[7] An adjusting journal entry is "[a]n accounting entry made into a subsidiary ledger called the General journal to account for a period['s] changes, omissions or other financial data required to be reported 'in the books' but not usually posted to the journals used for typical period transactions." *Ernest S. Ryder & Assocs., Inc., APLC v. Commissioner*, 122 T.C.M. (CCH) 25, 34 n.23 (2021) (quoting *Accounting Terminology Guide*, New York State Society of CPAs, https://www.nysscpa.org/professional-resources/accounting-terminology-guide#sthash.OMJATGaN.BomMsjPI.dpbs (last visited Aug. 21, 2025)).

[*8] IV.      *Preparation of Tax Returns*

   A.      *From Channels to Abedian*

   From its start in 2008 until 2016, Lakeview used Channels to help keep its books as well as prepare its tax return. Lakeview switched to Emil Abedian of Abedian & Totian, AAC, to prepare its 2016 tax return. Abedian is a licensed California CPA, and he relied on Lakeview's books as Channels had prepared them for that year.

   The reason for the switch was one that all Southern Californians can appreciate. Lakeview, the Garibyans, and Abedian were in Glendale, and Channels was all the way down the 405 in Costa Mesa. And, as we learned, Lakeview's unique accounting practices often required one of the Garibyans to make the long drive and deliver to Channels a cache of envelopes and documents to do the company's books. After nine years, Armond was understandably tired of making the drive.

   B.      *The 2015 Returns*

   For 2015, Channels tallied the ledger and reported $1.9 million in gross receipts on Lakeview's Form 1120, U.S. Corporation Income Tax Return. But he offset that with cost of goods sold and $1.8 million in deductions, including officer compensation, salaries and wages, advertising, and almost $500,000 in "other deductions." Lakeview thus reported a loss of more than $270,000.

   Armond himself reported $84,290 in salary—$78,790 of which was from Lakeview—on his 2015 return. He offset it with $67,602 in other losses that he now stipulates should have been included as "Other Income–Line 21" on his return rather than as losses. He filed as an individual, as he hadn't yet married Ani. Channels also prepared this return.

   C.      *The 2016 Returns*

   For the 2016 tax year, Abedian was faced with transitioning Lakeview and the Garibyans from Channels's unusual bookkeeping and tax preparation to his own. Abedian received an electronic copy of the QuickBooks ledger that Channels had prepared and transferred it to his program, checking it to make sure it seemed "reasonable"—which he deemed it was. He did make some entries and adjustments to Lakeview's general ledger, though, including backing out a deduction for

[*9] deferred payroll[8] that he noticed wasn't paid and increasing the firm's profit after noticing a portion of the accounts payable wasn't paid the next year. He then made another $140,000 adjusting journal entry to split out wages from accounts payable.

Abedian reflected these changes on Schedule L, Balance Sheets per Books, on Lakeview's 2016 return, reporting $490,840 in wages paid. The company reported $1.08 million in gross income, $909,629 in total deductions, and a $171,332 net operating loss.

On their first joint return, which Channels prepared, Armond and Ani reported $77,104 in total income. Much of this came from Ani's wages, as she was still working at a bank in 2015 and 2016 before she joined Lakeview. The couple attached a W-2 form that reported $467 in wages from Lakeview but offset most of this with "other losses" on their return.

V.   *Audit and Trial*

The Commissioner began looking into Lakeview because he noticed that it didn't deduct officer compensation in 2016 and took lots of uncategorized deductions. His revenue agent (RA) sent the company a letter asking it to identify a responsible person who could testify and produce books and records. Lakeview sent a profit-and-loss statement, a copy of its general ledger, bank statements from its two active WF accounts, its Forms 1099, and a copy of its bylaws.

After receiving and reviewing these, the RA and her manager met Armond and his representative at Lakeview's office. She learned about the business and how Armond made payments and deposits. With this information and the documents that Lakeview provided, the RA tried to reconcile Lakeview's profit-and-loss statements to the line items on its 2016 return.

She next reviewed Lakeview's general ledger. She found that the company wasn't recognizing income on a monthly basis in its accounts receivable despite issuing monthly invoices to Medicare, Medi-Cal, and private insurers. She also noticed irregularities in how entries were booked to the accounts receivable and accounts payable and decided to conduct a bank-deposits analysis. This is a method of income

---

[8] Abedian testified that, in his opinion, deferred compensation should be treated as a liability and not in the accounts-payable section of an accrual-based ledger as had been done by Channels.

[*10] reconstruction that the Commissioner may use when the taxpayer fails to provide accurate records. *See* §§ 6001, 446(b); *Parks v. Commissioner*, 94 T.C. 654, 658 (1990). It assumes all money deposited into a taxpayer's bank account during a period is taxable except for deposits that are transfers between accounts or that the agent concludes are otherwise nontaxable. Courts treat a valid bank-deposits analysis as *prima facie* evidence of income. *See Tokarski v. Commissioner*, 87 T.C. 74, 77 (1986).

A bank-deposits analysis is necessarily a cash analysis, and an IRS agent who conducts such an analysis of the deposits of an accrual-method taxpayer has to make adjustments. So the Internal Revenue Manual (IRM) has a procedure to adjust a bank-deposits analysis for an accrual-method taxpayer.[9] In this method, *see* IRM 4.10.4.6.4.6.2 (May 27, 2011), the key is for the RA to figure out the differences in both accounts payable and accounts receivable at the beginning and the end of each fiscal year. Any increase in accounts receivable over the course of the year increases an accrual-method taxpayer's income; an increase in accounts payable over the course of the year reduces an accrual-method taxpayer's income. It's important for an RA to make these adjustments to avoid an understatement or overstatement of income. *See Olive v. Commissioner*, 45 T.C.M. (CCH) 1249, 1264 (1983), *aff'd*, 749 F.2d 32 (4th Cir. 1984) (unpublished table decision); *Adler v. Commissioner*, 27 T.C.M. (CCH) 480, 496 (1968), *aff'd*, 422 F.2d 63 (6th Cir. 1970).

Following concessions, here are the adjustments in Lakeview's notice of deficiency that are still at issue:

| Tax Year | Adjustment Category | Amount Per Return | Adjustment in SNOD | Amount in Dispute |
|---|---|---|---|---|
| 2015 | Gross receipts or sale | $1,896,130 | $132,356 | $132,356 |
| | Misc. expenses (year-end accruals) | 1,875,127 | 222,218 | 222,218 |
| | Advertising | 14,068 | 7,233 | 7,233 |

---

[9] The agency's internal policies as reflected in the IRM don't have the force of law but can be instructive and persuasive authority. *See Gurule v. Commissioner*, 109 T.C.M. (CCH) 1315, 1321 n.9 (2015).

**[*11]**

| Tax Year | Adjustment Category | Amount Per Return | Adjustment in SNOD | Amount in Dispute |
|---|---|---|---|---|
| 2016 | Gross receipts or sales | $1,080,961 | $110,016 | $110,016 |
| | Other deductions (not listed) | 24,941 | 4,002 | 4,002 |
| | Misc. expenses (year-end accruals) | 116,215 | 29,341 | 29,341 |
| | Advertising | 2,989 | 1,685 | 1,685 |
| | Net operating loss deduction | 171,332 | 171,332 | 171,332 |

She then turned to the Garibyans, and examined both Armond's 2015 return, and Armond and Ani's 2016 return. Armond was uncooperative with her records request, so she issued a summons to Comerica for his and Ani's bank records. She performed another bank-deposits analysis on their three accounts at that bank. Following discussions with the Garibyans and their counsel about why certain deposits in these accounts should be treated as loans or otherwise nontaxable, she found understatements of income for both 2015 and 2016.

The Garibyans and Lakeview timely petitioned for our review. We tried these cases in Los Angeles. Because these are California taxpayers and we don't have a stipulation to the contrary, appellate venue presumptively lies in the Ninth Circuit. *See* § 7482(b)(1)(A), (B)(b)(2).

The parties settled a lot of issues. What's left to be decided is whether:

- Lakeview underreported its gross income or receipts for 2015 and 2016 by $72,829 and $110,016, respectively;

- Armond is required to include an additional $9,621 in his taxable income for 2015 and another $21,065 in his taxable income for 2016.

- Lakeview can deduct $4,002 in "other deductions" for 2016;

**[\*12]**  • Lakeview can deduct $222,218 and $29,341 for miscellaneous accruals for 2015 and 2016, respectively;

• Lakeview can deduct advertising expenses of $7,233 and $1,685 for 2015 and 2016, respectively;

• Lakeview had a net operating loss in 2016 of $171,332; and

• Lakeview is liable for accuracy-related penalties.

We will separate this discussion into three parts:

• income,

• deductions, and

• penalties.

## OPINION

### I.  *Income*

There are two issues of income still outstanding after the parties' partial settlement.  The big issue is Lakeview's income for 2015 and 2016.  The much smaller issue is Armond's income for 2015 and 2016.

#### A.  *Lakeview's Income for 2015 and 2016*

Lakeview reported a $272,124 loss in 2015 arising from $1,559,083 in total income against $1,831,207 in deductions.  It reported a $171,332 profit in 2016 arising from $1,080,961 in total income and $909,629 in deductions.

The general rule is that a taxpayer gets to follow its own method of accounting.  *See* § 446(a).  But that's true only if its method of accounting clearly reflects income and is consistently followed.  § 446(b). The Commissioner has a degree of discretion in determining whether a particular method of accounting clearly reflects income.  *RLC Indus. Co. & Subs. v. Commissioner*, 98 T.C. 457, 491 (1992), *aff'd*, 58 F.3d 413 (9th Cir. 1995).  But once he's made up his mind that a taxpayer's method doesn't clearly reflect income, he may determine the existence and amount of income with a method that clearly and reasonably reflects it

**[*13]** considering all surrounding facts and circumstances. *Id.*; Treas. Reg. § 1.446-1(a)(2).[10]

Whether Lakeview's accounting practices square with accrual accounting under the Code is central to these cases. The Code permits taxpayers to use the accrual method of accounting to report income. *See* §§ 446(a), (c), 451(a). When they elect the accrual method—as Lakeview did—the regulations say that they must report income in the year in which all events have occurred which fix the right to receive the income in amounts that can be reasonably determined. Treas. Reg. § 1.451-1(a). Income subject to this "all events test" for accrual accounting gets recognized at the earliest of the date a payment is received, is due, or the date of the contractual performance. *Harkins v. Commissioner*, 81 T.C.M. (CCH) 1547, 1550 (2001) (citing *Schlude v. Commissioner*, 372 U.S. 128 (1963)).

The Commissioner argues that Lakeview's accounting was such a mess that we should use his bank-deposits analysis instead. He also asserts that his RA examined Lakeview's WF statements against its ledger and returns. She performed a cash-to-accrual conversion in conformity with the IRM and removed interaccount transfers and other clearly identifiable nontaxable deposits. She concluded that Lakeview underreported its income.

We typically presume the Commissioner's notices of deficiency are correct and place the burden on a taxpayer to prove otherwise. *See Welch v. Helvering*, 290 U.S. 111, 115 (1933). The same is true when the Commissioner resorts to a bank-deposits analysis—a taxpayer has the burden to show that analysis is somehow inaccurate. *Palmer v. IRS*, 116 F.3d 1309, 1312 (9th Cir. 1997).

The Garibyans argue that it is the Commissioner's bank-deposits analysis that is flawed. If they can undermine this analysis by showing that it includes nontaxable deposits, the burden shifts back to the Commissioner to try to rehabilitate it. *See Clayton v. Commissioner*, 102 T.C. 632, 645–46 (1994).

---

[10] For cases appealable to the Ninth Circuit, the Commissioner is also required to show "some evidence" supporting the taxpayer's involvement in the activity that produced the missing income during the year at issue. *Weimerskirch v. Commissioner*, 596 F.2d 358, 361 (9th Cir. 1979), *rev'g* 67 T.C. 672 (1977). He easily met this burden here by introducing Lakeview's bank records, which show deposits from insurers and other hospice-related providers. *See Helvering v. Taylor*, 293 U.S. 507, 515 (1935).

**[\*14]** The key questions in resolving this dispute are whether:

- the use of a bank-deposits analysis was appropriate here;

- the Commissioner's analysis was properly done; and

- the Garibyans' alternatives and adjustments to that analysis are correct.

1.    *Was a Bank Deposits Analysis Appropriate?*

Section 446 expressly authorizes the Commissioner to reconstruct a taxpayer's income if the method the taxpayer employs doesn't clearly reflect income. § 446(b). He has great latitude in doing so—especially when a taxpayer fails to keep adequate books and records—and his reconstruction need only to be reasonable in light of all surrounding facts and circumstances. *Id.*; *Petzoldt v. Commissioner*, 92 T.C. 661, 687, 693 (1989).

The Commissioner argues here that his use of a bank-deposits analysis was justified because Lakeview's books weren't maintained on a proper accrual basis. Comparing the Garibyans' recordkeeping with our precedent, we have to agree. Lakeview's corporate books were wholly inadequate when lined up against the Code's requirements. The overuse of journal entries, zeroing out of accounts receivable seemingly at random, and inconsistencies with the actual deposits received make any connection between its books and reality tenuous at best.

Because Lakeview failed to keep adequate books that could be reconciled with its profit-and-loss statements on its returns, we find that the Commissioner's use of a bank-deposits analysis was appropriate.

2.    *Was the Bank Deposits Analysis Properly Done?*

The RA first calculated Lakeview's gross receipts. Then, to avoid an understatement of income, she took into account the difference in accounts payable and accounts receivable, as Lakeview itself reported on its returns. She added the increases in accounts receivable from the beginning of the year to the end of the year and assumed that all deposits were taxable unless shown otherwise. She then deducted the increase in accounts payable during the same period from gross receipts. She added decreases in accounts payable to the total deposits.

**[\*15]** This is all in accord with the Commissioner's own guidelines on how to do a bank-deposits analysis for an accrual-method taxpayer and produced a clearer reflection of Lakeview's income than Lakeview's own garbled accounting.

For 2015, she found gross receipts of about $2.2 million in Lakeview's WF #1732 account and about $2.1 million in its WF #1740 account in 2015. For 2016, she found about $1.1 million and about $771,000 in gross receipts for these accounts. And she found $1,142 in nontaxable deposits in the WF #1732 account and roughly $2.2 million in nontaxable transfers between that account and the WF #1740 account in 2015. She found nontaxable deposits of more than $860,000 in the WF #1732 account and $786 in the WF #1740 account in 2016. She did not find any interaccount transfers.

We summarize the bank-deposits analysis for 2015:

| Total Deposits | Reported Gross Receipts | Adjustment to Non-taxable Deposits | Adjustment to Accounts Receivable | Adjustment to Accounts Payable | Final Addition to Total Under-statement |
|---|---|---|---|---|---|
| $4,248,083 | ($1,896,130) | ($2,215,842) | ($116,460) | $112,702 | **$132,353** |

And we do the same for 2016:

| Total Deposits | Reported Gross Receipts | Adjustment to Non-taxable Deposits | Adjustment to Accounts Receivable | Adjustment to Accounts Payable | Final Addition to Total Under-statement |
|---|---|---|---|---|---|
| $1,957,395 | ($1,080,961) | ($865,053) | ($19,372) | $118,007 | **$110,016** |

> 3. *Are Lakeview's Alternatives and Adjustments Reasonable?*

Lakeview disagrees with the RA's conclusions for several reasons. The first is that the analysis used the incorrect accounts-payable figures. We disagree. Lakeview's reliance on the cash payments received and bills sent out by Consolo, while a useful source of evidence,

[*16] does not undermine the Commissioner's finding that Lakeview had unaccounted-for income in its accounts.

Lakeview next argues that the RA failed to consider a net decrease in cash in the WF accounts at the beginning of Lakeview's 2014 fiscal year compared to the close of its 2015 fiscal year. Lakeview says the effect of this was to inflate its gross receipts for 2015, and that it led to an incorrect balance in 2016. It also claims that the RA missed some nontaxable deposits.

The Commissioner's RA, as we've mentioned, did use the IRM's accrual-conversion process to perform her bank-deposits analysis. She noted the 2014 balances in the analysis. But this doesn't mean that the analysis was improper because of the amounts of these balances.

Lakeview's final position is that the RA missed some deposits that it says were nontaxable. It points specifically to deposits from Armond, Arsen, and Jaurugui. But there are also deposits from phone companies and even the City of Burbank. The parties stipulated that these disputed amounts were $89,543.85 for 2015 and $6,058.90 for 2016. But they also got into a bit of a fight about whether Lakeview had sufficient proof that some of these deposits were loans or capital contributions.

We think this fight doesn't make a lot of sense in these cases. Lakeview was in the hospice business. When it got small deposits from utility companies or larger deposits from the Garibyans or their friends or partners, we find it much more likely than not that the source of the deposits was not paying for hospice services. We don't really need to care whether those deposits represent loans or capital or small refunds. What matters is that they were not part of Lakeview's taxable income.

We therefore do find Lakeview's additional adjustments reasonable, and the parties should take them into account in their computations.

B. *Armond's Additional Income*

We must also decide whether Armond had additional reportable income for 2015 and 2016. The Commissioner found $89,621 that Armond purportedly received but failed to report for 2015. The parties dispute $9,621 of this total. For 2016, the Commissioner found $21,065 that Armond and Ani did not report as taxable income and the parties dispute the entire total.

**[\*17]** Armond points to an unusual pattern of withdrawals and redeposits. The record shows redeposits shortly after the withdrawals— for instance, a withdrawal on August 4 from one of Armond's Comerica accounts was redeposited in the same amount on the same date in another Comerica account.

On this one, we agree with Armond. We find it more likely than not that these were simply transfers from one account to another, not taxable income. We find that Armond is not required to include this last $9,621 in his 2015 income.

That leaves the $21,064.62 in extra taxable income still in dispute for 2016. The Garibyans conceded that Armond had an additional $46,590 in income from Lakeview that year that was deposited in the accounts that the RA analyzed. We agree with them that this means that amount shouldn't be added again to the total added to their taxable income by the bank-deposits analysis—that would be double counting. As best we can tell the RA did subtract this amount from income in her analysis, but only $32,400 of it. The difference between $46,590 and $32,400 is $14,190.

We need to subtract that sum from the $21,064.62 that was still in dispute, which leaves only $6,874.62. And this number, like the similar number for 2015, roughly matches the cash withdrawals and redeposits that the Garibyans seemed to have been in the habit of making.

We therefore find it more likely than not that the sums left in dispute "as additional income" showed by the RA's bank-deposits analysis for Armond's tax years 2015 and 2016 were not additional taxable income. The Garibyans win this one.

II.    *Lakeview's Business Expenses*

Lakeview next argues that, even if it had unreported income, it also had unjustifiably disallowed expenses. Those disallowed expenses are:

**[*18]**

| Tax Year | Deduction (or Loss) | Amount |
|---|---|---|
| 2015 | Miscellaneous accruals | $222,218 |
| | Advertising | 7,233 |
| 2016 | Miscellaneous accruals | 29,341 |
| | Other deductions | 4,002 |
| | Advertising | 1,685 |
| | Net operating loss | 171,332 |

The Code allows a deduction for all ordinary and necessary business expenses paid or incurred in carrying on a trade or business. § 162(a). Taxpayers are required to keep adequate records to substantiate these deductions. *Hradesky v. Commissioner*, 65 T.C. 87, 89–90 (1975), *aff'd per curiam*, 540 F.2d 821 (5th Cir. 1976).

We begin our discussion with Lakeview's more than $200,000 in "miscellaneous accruals" for 2015 and 2016. These may arise from Lakeview's agreements with nursing homes for reimbursement of room-and-board expenses, but Lakeview didn't substantiate them with invoices, receipts, or the like—just a copy of a lease. This extreme lack of substantiation makes it more likely than not the Commissioner's disallowance of these expenses is justified.

The disputed advertising expenses at issue for both years appear to have been paid to Arsen or one of his entities. All we have in the record to substantiate these expenses are handwritten expense reports without receipts or invoices. Given the parties' recordkeeping practices and potential intermingling of expenses among the Garibyan's various other entities, we sustain the Commissioner's disallowance of these deductions. For 2016, we also find that Lakeview waived its right to contest the $4,002 in "other deductions" because it did not address them in its opening brief. *See Stringer v. Commissioner*, 84 T.C. 693, 704 (1985), *aff'd*, 789 F.2d 917 (4th Cir. 1986) (unpublished table decision).

That leaves the disallowed net operating loss. For a net operating loss to be deductible, a taxpayer must maintain books and records from the loss years; a return only sets forth its claim and does not by itself substantiate a prior year's loss that it can carry forward. *See Lee v. Commissioner*, 91 T.C.M. (CCH) 999, 1001 (2006); *WB Acquisition, Inc. v. Commissioner*, 101 T.C.M. (CCH) 1157, 1169 (2011), *aff'd sub nom. DJB Holding Corp. v. Commissioner*, 803 F.3d 1014 (9th Cir. 2015).

**[\*19]** Because Lakeview points to and provides only its previous returns and its unreliable corporate ledger, we sustain the Commissioner's disallowance of this loss.

III.   *Penalties*

The only penalties remaining before us are Lakeview's accuracy-related penalties for 2015 and 2016.  There's a 20% accuracy-related penalty for underpayments attributable to negligence, or a substantial understatement of the tax due.  § 6662(a) and (b)(1) and (2).  Negligence is defined as a lack of due care or failure to do what a reasonable person would under the circumstances, Treas. Reg. § 1.6662-3(b)(1), and a substantial understatement in this case is 10% of what Lakeview was required to show on its returns, *see* § 6662(d)(1)(B).

Lakeview says it had reasonable cause for the underpayments and acted in good faith.  It has the burden of proof to show this.  *See* § 6664(c).  Reasonable cause includes an honest misunderstanding of fact or law that is reasonable given the experience, knowledge and education of the taxpayer.  Treas. Reg. § 1.6664-4(b)(1).  When an accounting system goes awry, there can still be a defense based on reasonableness and good faith even without the communication of professional advice needed under a *Neonatology* defense.  *See Pankratz v. Commissioner*, T.C. Memo. 2021-26, at \*38–39 (finding credible evidence that taxpayer attempted to correct a previous bookkeeping problem caused by reliance on a professional).  Reasonable cause requires that a taxpayer exercise ordinary business care and prudence as to the disputed items.  *See United States v. Boyle*, 469 U.S. 241, 246 (1985).

The Garibyans' bookkeeping system for Lakeview left much to be desired during the years at issue.  The Garibyans work in an industry where competent recordkeeping is especially important to getting paid and avoiding administrative audits.  *See Patacsil v. Commissioner*, T.C. Memo. 2023-8, at \*16 (contrasting the taxpayers with those required to keep fewer records or with greater organizational skills).

But we also find that the Garibyans aren't college educated and relied on two accounting professionals during the years at issue to keep their books and prepare their returns.  One of them, Channels, advised them to keep their books on an accrual basis, and we find it was the source of the bizarre entries in Lakeview's general ledger that rendered that ledger unreliable.

[*20] The nature of passthrough billing for hospice agencies that have to pass on funds to nursing homes complicated Lakeview's books. Neither Lakeview nor the Garibyans had previously had returns audited by the Commissioner nor been dinged by Medicare or Medi-Cal. This isn't exactly similar to *Pankratz*, T.C. Memo. 2021-26, at *38–39, where a taxpayer discovered a bookkeeping issue and worked in good faith to cure it by retaining a different accounting professional. It's a closer question, but we find by a preponderance of the evidence that Lakeview itself had reasonable cause and acted in good faith in using the bookkeeping system—and in preparing its 2015 and 2016 returns.

## CONCLUSION

This is a mixed result. And when combined with the numerous concessions and stipulations by the parties it means that

*Decisions will be entered under Rule 155.*